J-A19045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| K.T., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| H.T., | |
| Appellee | No. 454 WDA 2015 |

Appeal from the Order entered February 27, 2015,
in the Court of Common Pleas of Lawrence County,
Civil Division, at No. 11297/06 CA

| K.T., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| H.T., | |
| Appellee | No. 462 WDA 2015 |

Appeal from the Order entered February 27, 2015,
in the Court of Common Pleas of Lawrence County,
Civil Division, at No. 11297/06 CA

BEFORE:  BENDER, P.J.E., JENKINS and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                **FILED OCTOBER 19, 2015**

In these consolidated appeals, K.T. ("Father") appeals from the Order entered on February 27, 2015 (hereinafter "Custody Order") which (1) denied the competing Petitions for modification of the existing child custody Order entered on October 3, 2013 ("the prior custody Order"), filed by Father and H.T. ("Mother"), regarding their minor child, C.T. ("Child" or "C.")

(born in February 2001); and (2) granted Mother special relief relating to enforcement of the prior custody Order. The Custody Order continued to award Mother sole legal, and primary physical, custody of Child, and granted Father partial physical custody. The Order also included an enforcement provision requiring law enforcement officials and child protective services agents/employees to return Child to Mother, rather than Father or anyone acting on behalf of Father, if Child removed himself from Mother's physical custody (discussed in detail below). Father also appeals from a separate Order entered on February 27, 2015, which granted Mother's Petition for contempt concerning Father's violation of the prior custody Order (hereinafter "Contempt Order"). We affirm the Custody Order, and quash the appeal from the Contempt Order as interlocutory.

The factual and procedural background of this matter is exhaustively set forth in the trial court's 91-page Pa.R.A.P. 1925(a) Opinion, which we adopt and incorporate herein by reference. **See** Trial Court Opinion, 2/27/15, at 1-62. In the interest of conciseness and readability, we will briefly set forth the relevant facts and procedural history herein.

The trial court summarized the background of this case, and the parties' positions, as follows:

> The issues in this case revolve around the fact that [Child] refuses to be in the custody of Mother and[,] in fact[,] has not been in the physical custody of Mother since December [] 2013, despite the terms of the [prior] custody [O]rder. Mother claims that this circumstance [exists] because of the contemptuous conduct of Father[,] who has engaged in a pattern of parental alienation, turning [Child] against Mother[. W]hereas[] Father

contends that this circumstance is brought about by the manner in which Mother treats [Child], causing him to be in fear of her[,] and [Mother's] refusing to engage in any meaningful effort to keep [Child] in her custody.

*Id.* at 2.

The parties have engaged in contentious and continuous litigation since their separation in 2004, when Child was only three years-old. Before the entry of the prior custody Order, the parties shared physical and legal custody of Child, pursuant to a consent custody Order executed in March 2011. In the prior custody Order, entered on October 3, 2013, the trial court awarded sole legal and primary physical custody of Child to Mother, who is a dietician, and resides in Neshannock Township, Lawrence County, Pennsylvania. The prior custody Order also denied Father's Petition to relocate Child from Lawrence County to Westmoreland County.[1] Father is a physician, employed as a professor at the Lake Erie College of Osteopathic Medicine. Father moved to Westmoreland County in July 2013, and presently resides there.[2] Father's long-time paramour, M.E.S., has a residence in Neshannock Township, Lawrence County, located nearby

---

[1] Father appealed the prior custody Order. This Court affirmed, after which the Supreme Court of Pennsylvania denied allowance of appeal. *K.T. v. H.T.*, 104 A.3d 67 (Pa. Super. 2014) (unpublished memorandum), *appeal denied*, 95 A.3d 278 (Pa. 2014).

[2] Before the entry of the prior custody Order, the parties had lived in close proximity to one another in Neshannock Township, Lawrence County, and within the same school district.

Mother's residence, which we will hereinafter refer to as the "Fireside residence" or "Fireside."[3]

Despite the dictates of the prior custody Order providing Mother with primary physical custody, Child began to refuse to stay at Mother's residence, approximately one month after the entry of that Order. Trial Court Opinion, 2/27/15, at 7. Specifically, the trial court explained that

> [Child] and Father began a procedure whereby Father drops [Child] off at Mother's house[. A]t the custody exchange time, [Child] will either knock on Mother's door and tell her that he is not staying or simply walk through the backyards, and in either case, proceed directly to the [Fireside residence] of … [M.E.S.] Father will then email Mother[,] telling her that [Child] is at Fireside.

*Id.*

In its Opinion, the trial court detailed several incidents involving Child's refusal to stay with Mother during her scheduled custodial periods. The first of those incidents occurred on November 7, 2013, when Child left Mother's home, wearing only pajamas, at approximately 9:00 p.m., after which time Mother called 911 and went to the police station. *Id.* at 8. At the police station, Mother learned that M.E.S. had already picked up Child. *Id.* Child did not return to Mother's home. *Id.*

On December 16, 2013, Mother held a birthday party at her home, after which Child spent the night at Mother's home. *Id.* The following

---

[3] Fireside is located approximately two-tenths of a mile from Mother's residence.

morning, Mother transported Child to school. *Id.* Child told her that he would return to her home after school, but he did not do so. *Id.*

Mother next saw Child on January 1, 2014, when Father dropped him off at Mother's residence at 8:00 p.m., whereupon Child immediately ran away. *Id.* Mother and the maternal grandmother followed Child in Mother's car, and eventually caught up with him. *Id.* Child entered the back seat of the car, but, as the car pulled into Mother's driveway, Child jumped out and began running away. *Id.* Mother and the maternal grandmother followed Child again. *Id.* Child ran to the Fireside residence, and went inside. *Id.* at 8-9. Child thereafter came back out and got into the car with Mother and the maternal grandmother, and they drove away, with the intention of heading to the home of a female friend of Mother. *Id.* at 9. The trial court explained what ensued as follows:

> At an intersection, Mother could hear [Child's] seatbelt unclick. Fearing that [Child] was going to jump out of the car again, Mother directed the maternal grandmother to proceed. Mother turned around to grab [Child's] leg. [Child] opened the door and jumped out of the car. Mother's finger got stuck in the seam of his pants and ripped the bottom of his pants as he took off running. Mother called 911 and tried to find [Child]. At the direction of the police, Mother returned to her residence and waited. The police eventually notified Mother that [Child] was with Father.
>
> This incident resulted in the filing of a [P]etition for protection from abuse ["PFA Petition"] by Father[,] on behalf of [Child,] against Mother in the Westmoreland County Court of Common Pleas. After hearings before the Honorable Megan Bilik-DeFazio, Judge Bilik-DeFazio … dismissed the [PFA Petition]. Father filed a [P]etition for reconsideration[,] …

[which] was denied.[FN 1]

Father appealed the PFA denial to the Superior Court, which affirmed the decision of the trial court.[FN 2]

_____

[FN 1] In denying reconsideration, Judge Bilik-DeFazio referred to the case as one of the most tragic custody cases she had ever seen and one of the most tragic cases of parental alienation. The judge found [Child] to be very deliberate, that he knows what he is doing and that he is manipulating.

[FN 2] In the court's Pa.R.A.P. 1925(a) Opinion, the court found that Mother's testimony was credible, that Mother had never threatened [Child], that Mother's explanation of what occurred on January 1, 2014 was reasonable[,] and that the testimony of [Child] that Mother had threatened to kill him[,] and that he was "fearful" of Mother, was not credible. In finding that [Child] lacked credibility regarding his assertions that [] [M]other has threatened him and physically abused him, the court noted that [] [C]hild's testimony was deliberate and calculated; that he did not show emotion under the circumstances[;] and that[,] by his conduct and demeanor, [Child] was operating under a clear agenda to manipulate the [prior] custody [O]rder. The court also commented on a cell phone video which shows that [Child] is giving [] [M]other a hard time, [and] that he is talking back to [] [M]other and being difficult and unreasonable, but that Mother exercised a great deal of patience in dealing with [Child] and his unacceptable behavior in that situation.

*Id.* (footnotes in original).

The trial court additionally stated as follows:

[Child] has not been with [] [M]other since the incident of January 1, 2014. In the spring of 2014, Mother attended [Child's] band concert at Neshannock School and observed the concert, but [Child] would not spend any time with her at that event. Meanwhile, during this entire period of time, Father and [Child] continued the procedure whereby Father will drop [Child] off at Mother's residence but [Child] will not stay[,] and will proceed to the Fireside residence, where Father will pick up [] [C]hild. [Child] will videotape these events. He himself testified that he videotapes his interaction with [] [M]other for use of the videos in court.

In connection with the proceedings before the Westmoreland County Court of Common Pleas on the PFA Petition that Father brought on behalf of [Child], Father arrived at the Westmoreland County Courthouse on January 3, 2014. In passing through security, Father was asked if he had any weapons. Father denied having any weapons. Security discovered in his briefcase a loaded Glock 9mm firearm and a folding knife with a three and three-fourth[-]inch blade in Father's briefcase. Father was arrested and charged with Possession of a Firearm and Other Dangerous Weapon in a Court Facility pursuant to 18 Pa.C.S.A. § 913(a)(1). The disposition of the charge was that Father entered the Accelerated Rehabilitative Disposition Program for a period of six months. Father testified that he had forgotten that he had the items in his briefcase and that he generally carried a loaded firearm, [which] he had obtained from a friend who was in the scrap recycling business, for his own protection[,] as he was afraid that Mother would harm him[,] and that generally[,] he carried the loaded firearm to the efforts to [*sic*] effectuate custody exchanges.

***Id.*** at 10-11.

In relation to the prior custody Order, the trial court stated in its

Opinion as follows:

In awarding primary physical custody to Mother, the [c]ourt found that Father demonstrated a desire to frustrate Mother's relationship with [Child]. The [c]ourt also found that [Child] does want to conform to many of Father's expectations, and that [Child's] desire to please Father is negatively affecting his relationship with Mother. The [c]ourt noted that neither Father nor [Child] could testify to any positive attributes Mother possesses as a parent, thus indicating that [Child's] emotional connection to Mother is being hindered in some form[, and] that [it] is having a devastating effect on his emotional security and development. The [c]ourt also noted that, although the custody evaluator, Dr. [Douglas] Darnell, made no specific findings of parental alienation, [] Dr. Darnell's evaluation was completed prior to the fall of 2012, when [Child] began expressing his animosity towards [] [M]other[. Additionally], … when Dr. Darnell was presented with hypothetical questions regarding behaviors displayed by [Child], he testified that those behaviors

- 7 -

were consistent with behaviors exhibited by a child suffering from parental alienation. The [c]ourt also indicated that [Child's] negative perception of Mother was irrational. The court further concluded that Father's actions have caused Mother's relationship with [Child] to suffer[,] and that he has enabled [Child's] unwarranted fears and trepidations of Mother. The court also concluded, in awarding primary physical custody and sole legal custody to Mother, that if Father was awarded such custody, [Child's] relationship with Mother would dissipate to the point of disrepair.

*Id.* at 6-7 (footnote omitted).

While Father's appeal from the prior custody Order was pending, the parties filed several Petitions and Motions, which are more fully described in the trial court's Opinion; we adopt the trial court's recitation herein. *See id.* at 11-15. Most relevant to the instant appeal, on September 5, 2014, Mother filed a Petition for contempt ("September Petition for contempt"), asserting that Father had violated the prior consent Order by enrolling Child in the public school district that serviced the area of Father's residence in Westmoreland County, without Mother's consent or approval by the trial court.

In November 2014, and January 2015, the trial court held a custody trial with regard to the parties' competing Petitions for modification of the prior custody [O]rder, and Mother's Petitions for special relief and contempt in relation to that Order. On February 27, 2015, the trial court entered the Custody Order, which dismissed the parties' Petitions for modification of custody, and granted Mother special relief relating to enforcement of a particular provision of the Custody Order: paragraph 16. Paragraph 16

- 8 -

provided that law enforcement and/or child protective services were to return Child to Mother, regardless of the circumstances, if he runs away from her home while in her custody.[4]

Also on February 27, 2015, the trial court entered the Contempt Order, which, in relevant part, granted Mother's September Petition for contempt, based upon Father having unilaterally enrolled Child in a different school district. Mother alleged that Father's action violated a provision in the prior custody Order providing that Mother was the sole legal custodian of Child, and therefore, entitled to make all decisions concerning his education. Notably to the instant appeal, *the Contempt Order did not impose any sanctions on Father*.

Father timely filed Notices of Appeal from the Custody Order and Contempt Order, along with two Concise Statements of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In March 2015,

---

[4] Paragraph 16 specifically provides as follows:

> 16. During the time that … Mother … has the right of physical custody pursuant to this Order, [] [C]hild shall not be permitted to be at the residence designated as … Fireside … without Mother's consent nor shall [Child] be permitted for any reason to be placed in the custody or control of … Father … or [M.E.S.] without Mother's consent, and no law enforcement officer, employee or agent of Lawrence County Child and Youth Services, nor any other agency or authority, shall place[] [C]hild in the custody or control of Father, during Mother's scheduled primary custody period, with the further direction that if for any reason [] [C]hild removes himself from Mother's custody, he is to be returned to Mother and not Father or anyone acting on Father's behalf.

Custody Order, 2/17/15, ¶ 16.

Father filed in this Court a Motion to stay the Custody Order. Although we entered an Order temporarily granting the stay, on April 1, 2015, we entered an Order lifting the temporary stay and denying Father's Motion, directing Father to return Child to Mother two days later, at her residence. Approximately one week later, Father filed a second Motion to stay the Custody Order, which this Court denied.[5]

In his brief on appeal, Father presents the following issues for our review:

> I. Whether the trial court committed an abuse of discretion in awarding sole legal and primary physical custody to Mother[,] when the facts of record demonstrated that there was a complete breakdown of the relationship between Mother and [C]hild[,] and[,] for the past 14 months, that Mother had no contact with [] [C]hild during this time, and despite having sole legal custody[,] repeatedly failed to act in [] [C]hild's best interest in meeting [C]hild's medical, dental, mental health and educational needs?
>
> II. Whether the trial court committed an abuse of discretion in awarding primary physical custody to Mother[,] when the court engaged in no analysis [concerning] the effect of such an [award] on [] [C]hild as the circumstances existed at the time of trial, [which] uprooted [] [C]hild from school friends and his current life[,] and whether such an [award] was in [] [C]hild's best interest under the factors enumerated in 23 Pa.C.S. [§] 5328[,] and when Mother presented no current evidence to the [trial c]ourt as to her current ability to parent [] [C]hild as required under *M.E.V. v. F.P.W.*, 100 A.3d 670 (Pa. Super. 2014)?

---

[5] At oral argument, on July 8, 2015, Father's counsel informed this panel that Child was placed in a foster care home, after having refused to return to Mother's custody. Father additionally brought this matter to our attention via a post-submission Application for Supplement to the Record, which we denied.

III. Whether the trial court committed an abuse of discretion in awarding primary physical and sole legal custody to Mother by failing to properly consider and/or completely disregard the uncontroverted testimony and opinion[s] of the [c]ourt-appointed experts[,] and failing to mandate reunification counseling[,] as recommended by the [trial c]ourt's experts?

IV. Whether the trial court committed an abuse of discretion when it found that Father had alienated [] [C]hild from Mother[,] when there was no evidence presented of parental alienation[,] [] neither expert testified that they believed there was parental alienation[,] and the finding was based on pure speculation?

V. Whether the trial court committed an abuse of discretion when it ordered that law enforcement and/or child protective services were to return [] [C]hild to Mother[,] regardless of the circumstances?

VI. Whether the trial court committed an abuse of discretion when it found Father in contempt of the [prior custody] Order [] by enrolling [] [C]hild in school[,] as Father's actions were not an "intentional, designed act and one without justifiable excuse." **Com. ex rel. Wright v. Hendrick**, 312 A.2d 402[, 404] ([Pa.] 1973); the [prior custody] Order was not definite, clear and specific; there was no volitional violation or wrongful intent; Mother failed to provide for schooling pursuant to 24 P.S. [§] 13-1327[,] the Compulsory School Attendance Law; when Father was required to always consider [] [C]hild's best interest, make sure that [] [C]hild continued to attend school, continue other activities beneficial to [] [C]hild's overall growth and development[,] and exercise daily parental responsibility when [] [C]hild was in his physical custody[; and] when Mother had abdicated her parental responsibilities?

Father's Brief at 11.[6]

In custody cases, our standard and scope of review are follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent

_____

[6] In his Concise Statements, Father set forth his issues somewhat differently. Nevertheless, we determine that he preserved the issues for our review.

evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted); *see also Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007) (stating that "[a]n abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused.") (citation omitted). Additionally, this Court has observed that

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

As the custody trial in this matter was held in November 2014, and January 2015, the Child Custody Act (the "Act"), 23 Pa.C.S.A. §§ 5321 to 5340, is applicable. *C.R.F.*, 45 A.3d at 445 (holding that, if the custody

evidentiary proceeding commences on or after the effective date of the Act, *i.e.*, January 24, 2011, the provisions of the Act apply). With any custody case decided under the Act, the paramount concern is the best interests of the child. **See** 23 Pa.C.S.A. §§ 5328, 5338. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. **Id.** § 5338. Section 5328(a) of the Act sets forth the various factors that a trial court must consider when ordering any form of custody (collectively referred to as "the best interest factors"). **Id.** § 5328(a).

We will address Father's first and second issues together, since both involve challenges to the trial court's refusal to disturb the award of sole legal custody and primary physical custody to Mother under the prior custody Order. **See** Father's Brief at 21-34. Pointing to Child's repeated refusal to stay at Mother's residence during her custodial periods, Father asserts that Mother and Child are estranged. **Id.** at 22-23. According to Father, "Mother abandoned [Child] and any parental responsibilities for his care, safety, or emotional well-being when he refused to stay with her." **Id.** Father cites **McDonel v. Sohn**, 762 A.2d 1101 (Pa. Super. 2000), **Snarski v. Krincek**, 538 A.2d 1348 (Pa. Super. 1988), and **Jones v. Stone**, 495 A.2d 205 (Pa. Super. 1985), for the proposition that a parent's lack of involvement and abandonment of parental duties supports a modification of custody and award of custody to another person, even to a non-parent. Father's Brief at 27-28.

- 13 -

Father emphasizes that "the sole criterion in determining custody disputes is the best interest and paramount welfare of the child." *Id.* at 28-29 (quoting *M.E.V.*, 100 A.3d at 679) (emphasis in *M.E.V.*, citation omitted). Father points out the Court's statement in *M.E.V.* that "a trial court may not merely advert to prior, manifestly outdated findings of fact in lieu of express and fully explained reconsideration of those factors in the light of any changes in the parties' circumstances that occurred after the prior ruling and attendant explanation." Father's Brief at 27 (quoting *M.E.V.*, 100 A.3d at 681). Father additionally contends that the trial court cannot "simply pay lip service" to the best interest factors in section 5328(a). Father's Brief at 34 (citing *C.B. v. J.B.*, 65 A.3d 946 (Pa. Super. 2013)). According to Father, the trial court's Opinion "did not address which factor(s) weighed in favor of which party, … or how the factors affected its decision. Instead, the [t]rial [c]ourt came to the conclusion that Mother's relationship with [Child] was paramount to his best interests[,] without reference to findings to support that conclusion." Father's Brief at 34.

Father argues that Child's best interests are served by awarding primary physical custody to him, as he is the only parent who has provided for Child's physical, intellectual, moral, and spiritual well-being during the approximately fourteen-month period prior to the entry of the Custody Order. *Id.* at 36. Pointing to this period of separation, Father contends that "Mother offered not one scintilla of evidence … [as to] how she would keep Child in her care should Father[]" not be granted relief. *Id.* Father further

asserts that the trial court abused its discretion by failing to consider the effect on Child of his immediate return to Mother and his removal from the Hempfield School District (*i.e.*, where Father had enrolled Child without Mother's consent), absent the provision of immediate therapeutic intervention. *Id.*

In its Opinion, the trial court discussed the law concerning section 5328(a), set forth the best interest factors, and provided a thorough analysis of each of the factors. *See* Trial Court Opinion, 2/27/15, at 62-80.[7, 8] The trial court's analysis is sound and supported by the record, and we therefore adopt and incorporate it herein for purposes of Father's first and second issues. *See id.*

After addressing the law and the best interest factors, the trial court then stated in its Opinion as follows:

> Although extensive proceedings have been held on the [parties'] competing requests for modification, and for special relief and findings of contempt, essentially nothing has changed subsequent to the proceedings that resulted in the … [prior c]ustody Order[,] except that [Child] adamantly refuses to be with [] [M]other. [Child's] recalcitrance to being with [] [M]other was recognized by the trial judge in the prior proceedings. In the October [3], 2013 Opinion, the [trial] court noted that Father encourages [Child's] unreasonable

---

[7] Effective January 1, 2014, section 5328 was amended to include an additional factor at 23 Pa.C.S.A. § 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services). Although applicable at the time of the custody trial in the present matter, there was no evidence that would have required the trial court's consideration of this factor.

[8] We note that the trial court's discussion of factor 5328(a)(8) is not preceded by a heading, but appears to begin on page 71.

apprehension regarding Mother (Page 25); that Father has demonstrated a desire to frustrate Mother's relationship with [Child] (Page 29); that if Father is awarded primary physical and sole legal custody, [Child's] relationship with Mother will dissipate to the point of disrepair (Page 33); that the foregoing analysis finds fault in Father for enabling [Child's] unwarranted fears and trepidations of Mother; the [c]ourt believes that Father's actions have caused Mother's relationship with [Child] to suffer, but the [c]ourt does not believe that Father's actions should be characterized as alienating (Page 33).

Although the trial court in the prior proceedings stops short of characterizing Father's actions as alienating, the court did attribute [Child's] unfounded perceptions of [] Mother to be caused by Father's actions[,] and [found] that [Child's] thoughts about Mother paralleled those of Father.[FN 3] The court's prediction proved to be true, that if [Child] were left in the custody of Father, the relationship with [Child] and Mother would only deteriorate. However, the circumstance that allowed Father to have the custody was not brought about by court order, but by the fact that [Child] simply refused to be with Mother[.]

_____

[FN 3] More recently, Mother filed an injunction proceeding against [M.E.S.,] seeking to enjoin her from interfering in the custody matters. [**H.T. v. M.E.S.**], No. 1091 of 2014, C.A. The same trial judge [who] issued the … Custody Order in this case denied injunctive relief, but in a Pa.R.[A.]P. 1925(a) Opinion[,] found that the "root of [] [C]hild's behavior seems to have been derived from [Father]." (Pa.R.A.P. 1925(a) Opinion dated February 4, 2015, page 10[)].

Trial Court Opinion, 2/27/15, at 81-82 (footnote in original).

Our review of the record demonstrates that the trial court thoroughly considered each of the best interest factors, and its Custody Order sought to render a custody award in Child's best interests. Contrary to Father's assertion, the record reflects that the trial court did not merely rely on outdated findings. Rather, the court expressly and fully explained its consideration of the best interest factors, in light of the parties' actions, as

- 16 -

concerns Child's best interests, following entry of the prior custody Order.
The trial court determined that Mother had not abandoned Child, but,
instead, Child, with Father's assistance, had acted to obviate the prior
custody Order and deprive Mother of her court-awarded custody. Further,
the trial court found that, under the circumstances, Child's best interests are
served by maintaining the prior custody Order, awarding sole legal custody
and primary physical custody to Mother, and dismissing the competing
modification Petitions. We discern no abuse of discretion or error of law in
the trial court's analysis, and its findings are supported by the record.
Accordingly, we affirm based on the trial court's Opinion regarding Father's
first two issues, **see** Trial Court Opinion, 2/27/15, at 62-82, and conclude
that these issues lack merit.

Next, we address Father's third and fourth issues together. In his
third issue, Father contends that the trial court abused its discretion by (1)
awarding sole legal custody and primary physical custody to Mother in
disregarding, or failing to adequately consider, the uncontroverted testimony
and opinions of the court-appointed experts; and (2) failing to mandate
reunification counseling, as recommended by these experts. **See** Father's
Brief at 39-42. Father alleges that Dr. Martin Myers ("Dr. Myers"), the
court-appointed psychologist who evaluated Child, testified that Child is
flourishing in Father's custody, and recommended that Mother and Child
engage in counseling, and that Mother and Father each participate in
counseling. **Id.** at 37. Father states that Dr. Bruce Chambers ("Dr.

Chambers"), the court-appointed custody evaluator who performed an updated custody evaluation, testified that it would be problematic to return Child to Mother's custody without therapeutic intervention. *Id.* at 40. Father argues that the trial court's Order directing the immediate return of Child to Mother is against the weight of the evidence and against the uncontroverted testimony of these two experts. *Id.* at 41. According to Father, the trial court improperly rejected Dr. Chambers's testimony. *Id.* at 41-42. In support of this argument, Father relies on *Murphey v. Hatala*, 504 A.2d 917 (Pa. Super. 1986), for the proposition that it is an abuse of discretion for the trial court to accept as unpersuasive, and to totally discount, uncontradicted expert testimony. Father's Brief at 41.

In his fourth issue, Father argues that the trial court abused its discretion when it found that he had alienated Child from Mother, where there was no evidence of parental alienation and neither Dr. Myers nor Dr. Chambers had opined that there was parental alienation. *Id.* at 46-48. According to Father, the trial court's finding of parental alienation was based on pure speculation, and Mother's mere allegations. *Id.* at 46-47. Additionally, Father asserts that "[n]early all of the evidence of record supports that it was Mother's actions, not Father's, that were estranging her from [Child]. Particularly relevant was Mother's complete rejection of [Child] for a period of over 14 months, a fact the trial court summarily ignores in its Opinion." *Id.* at 47.

In **M.A.T. v. G.S.T.**, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), this Court held that a trial court may not simply dismiss uncontradicted expert testimony unless the court's independent determination is supported by the certified record. **Id**. at 19-20. Although a trial court is not bound by the custody evaluator's conclusions, it must actually consider the expert's analysis. **Id**. at 20. The **M.A.T.** Court held that "[s]o long as the trial court's conclusions are founded in the record, the lower court was not obligated to accept the conclusions of the experts." **Id**. (citation omitted); **see also King v. King**, 889 A.2d 630, 632 (Pa. Super. 2005) (stating that, if the certified record supports a trial court's conclusions in a custody matter, the trial court is not required to accept an expert's conclusions and recommendations).

In its Opinion, the trial court provided a detailed explanation for its rejection of the expert testimony of Drs. Chambers and Myers, as concerns section 5328(a)(8) of the Act (*i.e.*, the best interest factor pertaining to parental alienation), and set forth ample evidence in the certified record supporting the court's determination that Father had engaged in alienation. **See** Trial Court Opinion, 2/27/15, at 71-77, 83-86. Since the trial court's recitation of the evidence, and the court's determinations, are sound and supported by the record, we incorporate them herein with regard to Father's third and fourth issues. **See id.**; **see also M.A.T.**, 989 A.2d at 19-20. We affirm on this basis in rejecting Father's third and fourth issues, as we conclude that the trial court properly exercised its discretion in finding that

Father engaged in parental alienation, and in not following the custody experts' recommendations. *See* Trial Court Opinion, 2/27/15, at 71-77, 83-86; *see also King*, 889 A.2d at 632.

In Father's fifth issue, he argues that trial court abused its discretion when it directed, in paragraph 16 of the Custody Order, that law enforcement and/or child protective services must return Child to Mother if he runs away from her home while in her custody. *See* Father's Brief at 42-46. Father posits that, if Child refuses to stay with Mother, the effect of the provision is essentially an adjudication of Child as dependent, since it prohibits Child from being placed in Father's custody. *Id.* at 42-43. Father argues that the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.* (governing the adjudication and disposition of delinquent and dependent children), does not provide for a restriction on the placement of a dependent child *prior* to an adjudication of dependency. Father's Brief at 44. According to Father, paragraph 16 (1) excuses Lawrence County Children and Youth Services ("CYS") from meeting its burden to establish Child's dependency under the Juvenile Act, *id.* at 42-43; (2) violates Father's due process rights, *id.* at 43; and (3) violates the statutory mandate set forth in section 6301 of the Juvenile Act, 42 Pa.C.S.A. § 6301(b)(1), requiring the preservation of family unity whenever possible. Father's Brief at 45. Finally, Father maintains that the trial court has scheduled a dependency hearing concerning Child, who is still in placement. *Id.*

Our review of the record reveals that trial court created paragraph 16 of the Custody Order in response to Mother's request for special relief for enforcement of the prior custody Order. **See** Trial Court Opinion, 2/27/15, at 81. The prior custody Order had granted Mother primary physical custody, but Child was obviating that Order by running away from Mother's residence. In light of Child's repeated refusal to see Mother,[9] the trial court determined that this enforcement provision was necessary to ensure that the award of primary physical custody to Mother was enforced. **See id.** at 82 (stating that "the circumstance that allowed Father to have the custody was not brought about by court order, but by the fact that [Child] simply refused to be with Mother[. T]hat circumstance has been allowed to exist without being specifically addressed by the court relative to the aspect of enforcement of the [prior custody] Order."). We determine that the trial court's analysis supports its decision to grant Mother's request for special relief for enforcement of the prior custody Order.

Moreover, as support for his argument that paragraph 16 is inappropriate for a custody order, Father relies generally on the Juvenile Act and case law under its statutory provisions. However, paragraph 16 does not refer to the Juvenile Act, nor does this Court have an appeal before it under the Juvenile Act. Father asks this Court rule on a matter raised in his

---

[9] In its Pa.R.A.P. 1925(a) Opinion, the trial court set forth its analysis and legal support involving the refusal of a child to visit his parent, which we incorporate herein by reference. **See** Trial Court Opinion, 2/27/15, at 82-83.

- 21 -

second Motion for stay, which we denied until the matters raised therein are addressed by the trial court. In effect, Father would like this Court to prematurely rule on dependency proceedings that are before the trial court; we may not do so. **See** Pa.R.A.P. 302(a). Accordingly, we discern no abuse of discretion by the trial court's entering paragraph 16 in the Custody Order. Father is therefore not entitled to relief on his fifth issue.[10]

Finally, Father argues that the trial court abused its discretion when it found him in contempt of paragraph 2 of the prior custody Order, which granted Mother sole legal custody of Child, and the authority to, *inter alia*, make major decisions concerning Child's education. **See** Father's Brief at 48-53. Concerning Father's unilateral enrollment of Child in the Hempfield School District, prior to the commencement of the 2014-2015 school year, Father asserts that "[b]y the Fall of 2014, Mother had not taken care of [Child], nor acted as [Child's] custodial parent," and "Mother made no efforts for appropriate schooling or enrollment for [Child], since he was not staying in her house." **Id.** at 48, 49.

It is well-established that "each court is the exclusive judge of contempts against its process." **G.A. v. D.L.**, 72 A.3d 264, 269 (Pa. Super. 2013) (citation omitted). Additionally, "[t]his Court must place great

---

[10] We additionally observe that there is no information in the certified record regarding Child's allegedly pending juvenile adjudication and disposition, and/or his placement. **See Commonwealth v. Preston**, 904 A.2d 1, 6 (Pa. Super. 2006) (*en banc*) (stating that an appellate court is limited to considering only the materials in the certified record when resolving an issue).

- 22 -

reliance on the sound discretion of the trial judge when reviewing an order of contempt[,]" and we will not disturb a trial court's findings on a contempt petition absent a clear abuse of discretion. *Id.*

> To sustain a finding of civil contempt, the complainant must prove certain distinct elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent.

*P.H.D. v. R.R.D.*, 56 A.3d 702, 706 n.7 (Pa. Super. 2012) (citation omitted).

Here, the trial court found that Father's enrollment of Child in the Hempfield School District, violated paragraph 2 of the prior custody Order. Trial Court Opinion, 2/27/15, at 89-90. The trial court also found that Father had acted without the approval of the court or the consent of Mother, who had sole legal custody. *Id.* Additionally, the court determined that Father had acted intentionally and willfully, pointing out the Hempfield School District enrollment form completed by Father, wherein he stated that he had custody of Child. *Id.* at 90. The trial court, therefore, granted Mother's September Petition for contempt. *Id.* at 90-91. However, the court deferred the imposition of sanctions, pending the opportunity for Father to purge himself of the contempt. The Contempt Order, at paragraph 5, provides the following purge condition:

> 5. [Father] shall purge himself of contempt by strictly complying with all provisions of the [C]ustody [O]rder entered contemporaneously with this Order and any subsequent orders in this case. [Father] shall be deemed to have purged himself of

contempt if he remains in compliance for a period of (6) months from the date of this Order.

Trial Court Contempt Order, 2/27/15, ¶ 5.

We conclude that Father's appeal from the Contempt Order is interlocutory, as the Order imposes no sanctions on him. ***See Genovese v. Genovese***, 550 A.2d 1021, 1022 (Pa. Super. 1988) (stating that, unless sanctions are imposed, an order declaring a party in contempt is interlocutory, and that a threat to impose sanctions in the future is neither final nor appealable). We, therefore, quash Father's appeal from the Contempt Order at Docket No. 462 WDA 2015 as interlocutory.[11, 12]

Appeal at Docket No. 454 WDA 2015 affirmed; appeal at Docket No. 462 WDA 2015 quashed as interlocutory.

---

[11] On April 2, 2015, this Court issued a Rule on Father, directing him to show cause as to why this appeal should not be quashed as interlocutory. Father's counsel responded by claiming that the trial court used the contempt finding in its custody ruling in relation to the Custody Order. On April 17, 2015, we discharged the Rule, pending a review by this panel. Upon our review, we determine that the trial court, in making its Custody Order, did not rely upon the contempt finding. Rather, the trial court considered Father's unilateral actions in enrolling Child in the Hempfield School District, without the prior consent of Mother or the approval of the trial court. While these same actions were the basis for the trial court's contempt finding, the contempt finding was not the basis for the court's decision to maintain the prior custody Order in place. ***See*** Trial Court Opinion, 2/27/15, at 87-90.

[12] In her brief, Mother requests the imposition of costs on Father. ***See*** Mother's Brief at 19. However, she has not filed a motion for costs or developed the request; accordingly, this claim is waived. ***See In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); ***see also*** Pa.R.A.P. 2119(a).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2015

K███ T████,

    Plaintiff

VS.

H███ T████,

    Defendant

    :  IN THE COURT OF COMMON PLEAS
    :  LAWRENCE COUNTY, PENNSYLVANIA
    :  NO. 11297 OF 2006, C.A.

## APPEARANCES

For Plaintiff:

Richard B. Sandow, Esq.
C. Kurt Mulzet, Esq.
Stephanie T. Anderson, Esq.
Jones, Gregg, Creehan &
    Gerace, LLP
411 Seventh Avenue
Suite 1200
Pittsburgh, PA  15219

For Defendant:

Richard Ducote, Esq.
Erica Burns, Esq.
Richard Ducote, PC
4800 Liberty Avenue
3rd Floor
Pittsburgh, PA  15224

## OPINION

MOTTO, P.J.

FEBRUARY 27, 2015

In this custody dispute presently before the Court, H███ T████, (hereinafter "Mother") seeks enforcement of the Order of Court dated October 1, 2013 issued by the Honorable Thomas M. Piccione which granted her sole legal and primary physical custody of the minor child, C███ T████, born February 10, 2001, and, further, seeks modification of that custody order by awarding her sole physical custody and providing Father with closely supervised visitation, as opposed to partial custody. K███ T████, (hereinafter "Father") seeks modification of the

53RD
JUDICIAL
DISTRICT

RENCE COUNTY
ENNSYLVANIA

FEB 27 2015

October 1, 2013 custody order by awarding him the sole legal and physical custody of C███, with C███'s further contact with Mother to be as may be advised through reunification counseling.

The issues in this case revolve around the fact that C███ refuses to be in the custody of Mother and in fact has not been in the physical custody of Mother since December of 2013, despite the terms of the October 1, 2013 custody order. Mother claims that this circumstance is because of the contemptuous conduct of Father who has engaged in a pattern of parental alienation, turning C███ against Mother; whereas, Father contends that this circumstance is brought about by the manner in which Mother treats C███, causing him to be in fear of her and refusing to engage in any meaningful effort to keep C███ in her custody.

The record of this case will reflect that the parties have engaged in continuous litigation since their separation in 2004. The custody litigation originally began in the Court of Common Pleas of Allegheny County, Pennsylvania, with jurisdiction being transferred to this court in August of 2006. The Court will not here recant the entire procedural history of the case since 2006; however, the opinion of Judge Thomas M. Piccione in support of his October 1, 2013, Order provides a detailed procedural history up to the point of the order of October 1, 2013. The Court will, however, review the history of this case from March 15, 2011, the date on which a consent custody order was entered, in order to provide some perspective on this case.

53RD
JUDICIAL
DISTRICT

RENCE COUNTY
NNSYLVANIA

2

The March 15, 2011, order provided the parties with shared legal and shared physical custody with Mother and Father to exercise custody on an alternating weekly basis, with exchanges to take place on Sundays at 5:00 p.m. At this time, the parties had lived in close proximity to one another in Neshannock Township, Lawrence County, and within the same school district. The parties, however, were unable to communicate with one another, and litigation followed which resulted in the Court appointing a guardian ad litem for Conner and requiring the Court to hear emergency relief petitions addressing such things as C████'s extracurricular activities, which dentist he would treat with, and issues surrounding Father's efforts in obtaining a passport.

On September 17, 2012, the guardian ad litem for C████ presented a motion for leave of court to withdraw. The basis for this request was that Father had taken C████ to the office of the guardian ad litem; C████ informed the guardian ad litem that he no longer wanted to work with the guardian ad litem; and, thereafter, C████ walked out of the office of the guardian ad litem with his Father. The guardian ad litem was given leave to withdraw.

Also on September 17, 2012, Mother filed a petition for protection from abuse against Father alleging that on September 16, 2012, a verbal altercation occurred between Mother and Father, joined in by Father's girlfriend, M██ E██ S███, and that Father and Ms. S████ had threatened her during the altercation.

On October 15, 2012, Father presented a motion for emergency custody order, wherein Father alleged that Mother and Maternal Grandfather were attempting to intimidate C████ in regards to the custody dispute and that Mother had physically attacked C████ on September 30, 2012.

On November 28, 2012, Father filed a petition for contempt alleging that Mother was in violation of existing orders of court for permitting third parties to attend custody exchanges and discussing the proceedings with C████. Father also filed a petition for protection from abuse against Mother on C████'s behalf on November 29, 2012, alleging that on Sunday, November 25, 2012, Mother physically grabbed C████ in an attempt to confiscate the child's cell phone when C████ attempted to call Father. The petition further alleged that Mother's father (hereinafter "Maternal Grandfather") arrived at Mother's residence and forced himself into C████'s room, pinning C████ on the ground, and striking C████'s head against the floor. The next day, November 30, 2012, Father filed another protection from abuse petition alleging that Mother threatened C████ on November 29, 2012 by refusing to provide C████ with food or drink until C████ wrote a letter to Maternal Grandfather and that Mother became physically violent with C████ and prevented him from leaving her residence.

All of the foregoing petitions for protection from abuse, motions for emergency custody order, and contempt petitions were dismissed by the Court after hearing, and on February 6, 2013, the Court entered an order reinstating the March 15, 2011

Custody Consent order which provided for shared physical and legal custody. Additionally, the Court directed the parties to begin counseling for C████'s benefit.

By May 30, 2013 both parties had filed competing claims for primary custody; however, on June 18, 2013, Father filed a notice of relocation proposal, which was objected to by Mother. The relocation request came about because Father had relocated to Greensburg, Westmoreland County, Pennsylvania for reasons related to his employment.

On August 20, 2013, a six-day custody and relocation hearing commenced, which resulted in the October 1, 2013 order.

The proceedings before Judge Piccione addressed the issue of C████ being anxious about seeing Mother for any period of time, with events of C████ either running from his mother or not showing for custody exchanges. Mother acknowledged that prior to the fall of 2012, her relationship with C████ was normal; but that in November of 2012 C████'s attitude towards his mother began to change. In November of 2012, Father began calling C████ while C████ was at Mother's house and having extensive phone conversations that would last for hours. Contrary to the description of events that occurred on November 25, 2012 indicated by C████, Mother recounted that C████ arrived at her house and would not speak to her; that C████ was on the phone with Father for an extended period of time and would not get off of the phone. At about 9:00 C████ got off of the phone with Father and came out of his room screaming "you're going to kill me". Mother was unable to calm C████ down so she

called her parents for help. When Maternal Grandfather arrived at the residence, C█████ barricaded himself in his bedroom against his door. Maternal Grandfather had to force his way into C█████'s bedroom causing C█████ to be pushed across the floor. C█████ then threw himself on the ground, thrashing his arms and legs and slamming his head on the ground. Mother and Maternal Grandfather physically restrained C█████ by holding down his arms and legs until he regained control of himself.

After this incident, a period of time ensued where Mother did not see C█████ because of the pending protection from abuse petitions and the litigation that flowed therefrom. In February of 2013, C█████ again began staying at Mother's residence and the parties continued to alternate custody on a week-on and week-off basis, which continued until the custody order was entered by Judge Piccione on October 3, 2013. In awarding primary physical custody to Mother, the Court found that Father demonstrated a desire to frustrate Mother's relationship with C█████. The Court also found that C█████ does want to conform to many of Father's expectations, and that C█████'s desire to please Father is negatively affecting his relationship with Mother. The Court further noted that neither Father nor C█████ could testify to any positive attributes Mother possesses as a parent, thus indicating that C█████'s emotional connection to Mother is being hindered in some form that is having a devastating effect on his emotional security and development. The Court also noted that, although the custody evaluator, Dr. Darnell, made no specific findings of parental alienation, that

Dr. Darnell's evaluation was completed prior to the fall of 2012, when C⬛ began expressing his animosity towards his mother, and that when Dr. Darnell was presented with hypothetical questions regarding behaviors displayed by C⬛, he testified that those behaviors were consistent with behaviors exhibited by a child suffering from parental alienation. The court also indicated that C⬛'s negative perception of Mother was irrational. The court further concluded that Father's actions have caused Mother's relationship with C⬛ to suffer and that he has enabled C⬛'s unwarranted fears and trepidations of Mother. The court also concluded, in awarding primary physical custody and sole legal custody to Mother, that if Father was awarded such custody, C⬛'s relationship with Mother would dissipate to the point of disrepair.[1]

Approximately one month after the October 1, 2013 custody order, C⬛ began refusing to spend any time with his mother. C⬛ and Father began a procedure whereby Father drops C⬛ off at Mother's house; at the custody exchange time, C⬛ will either knock on Mother's door and tell her that he is not staying or simply walk through the backyards, and in either case, proceed directly to the residence of Father's girlfriend, located near Mother's residence and identified as the "Fireside Residence". Father will then email Mother telling her that C⬛ is at Fireside.

---

[1] Judge Piccione's order of October 3, 2013 was appealed by Father to the Superior Court of Pennsylvania, which affirmed the October 3, 2013 order in its Opinion filed May 30, 2014.

On November 7, 2013, C▮▮▮ was at his mother's residence. At about 9:20 p.m. C▮▮▮ got out of bed, went into the bathroom and then immediately came back out and went down the steps and out the front door. The weather was cold, with ice and snow, and C▮▮▮ was wearing nothing but pajamas. Mother called 911. Mother then went to the police station. While she was at the police station, the police informed her that they had received a call from Father stating that Father's girlfriend had picked C▮▮▮ up and taken him to Cranberry and that they were on the way back from Cranberry. C▮▮▮ did not immediately return to Mother's home.

C▮▮▮ came to Mother's house on December 16, 2013 after school and spent the night. The next day, Mother took C▮▮▮ to school. A birthday party had been held at Mother's house on the night of December 16, 2013, and company was over. The next morning, Mother took C▮▮▮ to school and asked him if he was coming to her house after school. C▮▮▮ said "Yes." Mother said that she would see him after school and that she loved him, and C▮▮▮ said "Love you, Mom" and got out of the car. However, C▮▮▮ did not go to his mother's home on December 17, 2013, and the next time that Mother saw C▮▮▮ was on January 1, 2014. On that date, Father dropped C▮▮▮ off at about 8:00 p.m. and C▮▮▮ took off running. Mother and the maternal grandmother got into their car to follow him. C▮▮▮ got into the back of the car, but as they pulled back into their driveway, C▮▮▮ jumped out and took off running again. Mother and her mother followed him again. C▮▮▮ went back to the

Fireside residence and went inside. C████ came back out and got back into the vehicle and they drove away. Mother and the maternal grandmother decided that they would go to the home of Mother's girlfriend. At an intersection, Mother could hear C████'s seatbelt unclick. Fearing that C████ was going to jump out of the car again, Mother directed the maternal grandmother to proceed. Mother turned around to grab C████'s leg. C████ opened the door and jumped out of the car. Mother's finger got stuck in the seam of his pants and ripped the bottom of his pants as he took off running. Mother called 911 and tried to find C████. At the direction of the police, Mother returned to her residence and waited. The police eventually notified Mother that C████ was with Father.

This incident resulted in the filing of a petition for protection from abuse by Father on behalf of C████ against Mother in the Westmoreland County Court of Common Pleas. After hearings before the Honorable Megan Bilik-DeFazio, Judge Bilik-DeFazio by Order dated February 5, 2014 dismissed the protection from abuse petition. Father filed a petition for reconsideration and by order dated April 2, 2014 the motion for reconsideration was denied.[2]

Father appealed the PFA denial to the Superior Court, which affirmed the decision of the trial court.[3]

---

[2] In denying reconsideration, Judge Bilik-DeFazio referred to the case as one of the most tragic custody cases she had ever seen and one of the most tragic cases of parental alienation. The judge found C████ to be very deliberate, that he knows what he is doing and that he is manipulating.
[3] In the court's Pa.R.A.P. 1925(a) opinion, the court found that Mother's testimony was credible, that Mother had never threatened C████, that Mother's explanation of what occurred on January 1, 2014 was reasonable and

C▇▇▇ has not been with his mother since the incident of January 1, 2014. In the spring of 2014, Mother attended C▇▇▇'s band concert at Neshannock School and observed the concert, but C▇▇▇ would not spend any time with her at that event. Meanwhile, during this entire period of time, Father and C▇▇▇ continued the procedure whereby Father will drop C▇▇▇ off at Mother's residence but C▇▇▇ will not stay and will proceed to the Fireside residence, where Father will pick up the child. Conner will videotape these events. He himself testified that he videotapes his interaction with his mother for use of the videos in court.

In connection with the proceedings before the Westmoreland County Court of Common Pleas on the PFA Petition that Father brought on behalf of C▇▇▇, Father arrived at the Westmoreland County Courthouse on January 3, 2014. In passing through security, Father was asked if he had any weapons. Father denied having any weapons. Security discovered in his briefcase a loaded Glock 9mm firearm and a folding knife with a three and three-fourth inch blade in Father's briefcase. Father was arrested and charged with Possession of a Firearm and Other Dangerous Weapon in a Court Facility pursuant to 18 Pa.C.S.A. §913(a)(1). The disposition of the charge was that Father

---

that the testimony of C▇▇▇ that Mother had threatened to kill him and that he was "fearful" of Mother, was not credible. In finding that C▇▇▇ lacked credibility regarding his assertions that his mother has threatened him and physically abused him, the court noted that the child's testimony was deliberate and calculated; that he did not show emotion under the circumstances and that by his conduct and demeanor, C▇▇▇ was operating under a clear agenda to manipulate the custody order. The court also commented on a cell phone video which shows that C▇▇▇ is giving his mother a hard time, that he is talking back to his mother and being difficult and unreasonable, but that Mother exercised a great deal of patience in dealing with C▇▇▇ and his unacceptable behavior in that situation.

entered the Accelerated Rehabilitative Disposition Program for a period of six months. Father testified that he had forgotten that he had the items in his briefcase and that he generally carried a loaded firearm, that he had obtained from a friend who was in the scrap recycling business, for his own protection as he was afraid that Mother would harm him and that he generally carried the loaded firearm to the efforts to effectuate custody exchanges.

The foregoing circumstances wherein Mother was awarded primary physical custody, but the same was never accomplished, created a new wave of petitions for special relief, contempt and ultimately, competing claims for modification of the October 1, 2013 custody order, all of which petitions, motions and modification requests are being presently before the Court for disposition.[4]

On December 3, 2013, Mother filed an emergency petition for special relief asserting that Father has continued in a relentless campaign to undermine and sabotage C████'s life with Mother by making numerous false complaints of abuse and neglect; encouraging C████ to run away from Mother's home and go to Father's girlfriend's home at Fireside; repeatedly contacting C████'s school to make false reports of abuse; repeatedly going

---

[4] None of these motions have been previously determined. Father appealed the October 1, 2013 custody order. The trial court took the position that the pendency of the appeal deprived the Court of jurisdiction to decide the motions that were filed during the pendency of the appeal. After the appeal was resolved by affirment of the trial court's order of October 1, 2013, the trial judge, Thomas M. Piccione, commenced proceedings on all matters that were pending before him, but could not complete the same because of a medical condition. The case was then assigned to Senior Judge Francis J. Fornelli, who ultimately recused himself from the case. The case then became assigned to the undersigned subsequent to Judge Fornelli's recusal Order of September 16, 2014.

to C____'s therapist and telling him that Mother is "crazy" and maligning the therapist against Mother; encouraging C____ to perform poorly at school; telling C____ that the Mother and maternal grandparents will harm him; and telling C____ to disobey his Mother and to create conflict so that false allegations can be generated against Mother. The petition requested that Mother be provided complete control over C____'s cell phone; complete authority over the selection of C____'s therapist; giving Mother complete authority over C____'s ability to have telephone conversations with Father while in her custody; prohibiting Father from injecting himself into C____'s therapy; prohibit C____ from being at the Fireside residence without Mother's consent except when he is with Father during court-authorized scheduled partial custody with Father; prohibiting C____ from being in the care or presence of Father's girlfriend without Mother's consent except when Father is exercising court-authorized partial custody; requiring Lawrence County Children and Youth Services to provide a copy of all reports and investigations concerning C____ to Mother; ordering that all law enforcement agencies and Lawrence County. CYS and any other agency return Conner only to Mother, should C____ leave Mother's home without her consent; and prohibiting Father from doing anything to undermine Mother's authority or undermine or sabotage C____'s remaining in Mother's home or performing at C____'s level of competence in school.

On January 7, 2014, Mother filed an emergency supplemental petition for special relief adding a first person narrative of

53RD
JUDICIAL
DISTRICT

RENCE COUNTY
NNSYLVANIA

C_____'s behavior asserting that it is a product of Father's manipulation and coercion and requesting that the Court impose heavy monetary incentives upon Father to convince him that it is in his best interest to support C_____'s relationship with Mother. The narrative recited C_____'s refusal to stay with his Mother, each time either walking through Mother's yard back to Fireside, or stopping at Mother's house telling her that he was not staying and leaving and going to the Fireside residence, C_____ recording with his cell phone his actions and an incident on December 8, 2013 where Mother followed C_____ to Fireside, tried to get him into the car with her, which he refused, with C_____ recording her, which incident ended with C_____ staying with Father and Father's girlfriend at Fireside and police refusing to enforce the order by returning C_____ to Mother. The narrative includes repeated incidents of C_____ getting off the bus near Mother's residence, walking through the back yards to Fireside, and not staying with Mother.

On April 8, 2014, Mother filed a petition for contempt reciting that since entry of the October 1, 2013 order, Mother, who has primary custody of C_____, has only had custody of C_____ for one overnight on December 16, 2013 and that all other times Conner is improperly in the custody of Father or Father's girlfriend. Mother recites in this petition that Father pays lip service to the order by dropping C_____ off at Mother's residence every other Sunday, wherein C_____ gets out of the car, runs to Father's girlfriend's residence where Father is waiting for C_____. Father picks C_____ up on the street behind

Mother's residence and they depart. Mother further asserts in this petition that Father blatantly undermines Mother's role as a parent and speaks of her in a derogatory, condescending and otherwise inappropriate manner in an effort to reinforce C████'s unfounded beliefs about Mother. Mother also alleges in this petition that Father refuses to communicate with Mother and provide her any information about C████.

On July 1, 2014, Father filed a petition for modification of primary physical and legal custody reciting that C████ has not spent an overnight with Mother since December, 2013 and that the best interest of C████ would be served by awarding Father physical and legal custody.

On July 28, 2014, Mother filed an answer to the petition for modification of custody asserting that Father has acted in defiance of the October 1, 2013 custody order; that Father has engaged in a course of conduct designed to deliberately thwart the mother-child relationship and that awarding custody of C████ to Father would not be in his best interest. Mother also in said pleading counterclaimed for modification of the custody order requesting that the October 3, 2013 order be modified to limit Father to professionally supervised contact and visitation of C████ at his sole cost reciting all of the allegations made in the previous petitions filed by Mother and also referencing the petition for protection from abuse proceeding filed by Father in Westmoreland County on January 2, 2014 that was based on the January 1, 2014 incident wherein C████ jumped out of the car that he was occupying with Mother and also referencing the

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
'ENNSYLVANIA

14

January 3, 2014 incident wherein Father brought the loaded Glock mm firearm and folding knife in his briefcase into the Westmoreland County Court of Common Pleas.

On August 26, 2014, Father filed an amended petition for modification of the custody order specifically reciting that the order should be modified because Mother has not exercised any custody, legal or physical, of C███ since on or about December 12, 2013 and that C███ refusing to go to Mother's house for Mother's periods of court-ordered custody time.

On September 5, 2014, Mother filed a petition for contempt reciting that C███ was to begin school at Neshannock Junior Senior High School on August 25, 2014, Neshannock being the school district that C███ had always attended, and that Father, in direct violation of the October 1, 2013 custody order, enrolled C███ in the Hempfield School District without any notice, discussion or other information to Mother, the school district being in Westmoreland County, the county in which Father now resides. The petition further recites that Father has continued to deny or coerce, conspire and otherwise control C███ in an effort to deny Mother her primary physical custody.

## SUMMARY OF EVIDENCE

Father was called to testify as on cross by Mother. Father testified that on January 3, 2014, he brought a loaded gun into the Westmoreland County Courthouse. It was a 9mm handgun with ten lives rounds in it. In addition, he had a folding knife in his briefcase. The weapons were in his briefcase from the day

before when he had come to Lawrence County. He stated that he had these weapons in his briefcase Mother has threatened to kill him and C████. Father stated that Mother had just dragged C████ from behind her SUV and he was fearful for his safety and for C████'s. He acknowledged that he had these weapons to use against Mother if necessary. Father carried a gun with him nearly every day when he lived in Lawrence County. Father testified that he had forgotten he had the gun and knife in his briefcase when he entered the Westmoreland County Courthouse for the purpose of obtaining a PFA on behalf of C████ against Mother. Father does have a permit to carry a firearm. The gun had been loaned to Father by a Mr. Lewis who was fearful for Father's safety. Mr. Lewis felt this way because of information received from Father. Father still feels that he needs to protect himself from Mother.

Father acknowledges that the current custody order of October 1, 2013 provides for C████ to be living with Mother, although in fact C████ has been living with him. Father further acknowledges completing the student enrollment form for the Hempfield Area School District and signing it on August 21, 2014 in order to enroll Conner in the Hempfield Area School system. Father acknowledged that Mother did not agree for him to do this. On this form the information Father provided was that C████ lives with him, that Ms. S████ is the other caretaker or adult in the home, Father's and Ms. S████'s contact phone numbers are provided with no phone number for Mother. The form further required information as to "legal

custody/court documents/special arrangements" relative to which Father placed "Father". Father explained that he answered that way because he felt that the current situation constituted special arrangements as Mother has abdicated her role as a parent. Father felt that he had no choice but to enroll him in Hempfield because Mother would do nothing to keep C██████ enrolled in Neshannock. Father maintains that Mother has refused to provide C██████ a place to live.

Father takes C██████ every other Sunday night at 5:00 p.m. for the custody change but Mother usually is not there.

Father moved to Greensburg in July of 2013. He had previously been a family physician at Family Health Care Partners in Mercer and Grove City and was admitted to the Grove City Medical Center. Father is now the Assistant Clinical Professor of Family Medicine and Osteopathic Principles and Practice at the Lake Erie College of Osteopathic Medicine located at the Seaton Hill campus in Greensburg, Pennsylvania. Although Father had other opportunities for teaching, he chose the Seaton Hill campus because it was the closest to where Mother lived, foregoing other opportunities to teach at medical schools that were farther away.

Father testified that Mother lives on Shenango Road in Neshannock Township, Lawrence County, while Ms. S██████ owns a residence on Fireside Drive that is located approximately two-tenths of a mile from Mother's residence.

Father noted that subsequent to the October 1, 2013 custody order, C██████ was living with Mother but on November 7, 2013, he

began running away from Mother. Late that evening C████ ran out of the house, in the evening, wearing nothing but pajamas and a pair of socks. It was approximately 30 degrees with snow on the ground. He ran from Mother's house to Fireside Drive where Ms. S████ was staying. Father was called and told by Ms. S████ that C████ was inconsolable. Ms. S████ was enroute to take C████ to a hospital because he was so upset, but Father spoke with Ms. S████ on the telephone and directed her to return to Fireside. The police called Father and Father advised where C████ was. Father spoke with C████, and C████ explained that he was upset because of the yelling and screaming that was going on at Mother's home. Father went to Fireside and had C████ sleep at Fireside that night. Father had sent Mother an email telling her where C████ was and that he was safe. Mother did not come to Fireside to pick up C████. Mother sent an email indicating that C████'s backpack and school items would be on her front porch, and in fact, Father picked up C████'s things from Mother's front porch on the way to school the next day at Neshannock.

The next day C████ refused to leave school because he did not want to return to his Mother's. Eventually, C████ did go to Mother's house, and she brought him to Father's house as part of the custody exchange in Greensburg. C████ had been fearful that Mother would not return him to Greensburg for the custody exchange, but once he was assured that she would do so, he agreed to go with Mother.

C████ returned to Mother on the exchange day of November 10, 2013. C████ was to be with Mother for the week, but on November 13, 2013, C████, after school, went to Fireside. Initially, C████ had refused to leave school that day. C████ had informed the guidance counselor that he would not leave school because he would not go with his mother. Mother was informed of the situation and sent the maternal grandmother to attempt to get C████. C████ refused to go with her. The school called the police, and an Officer Sikes was dispatched to the school to talk to Conner. C████ was taken to the police station. Eventually the police officer drove C████ to Mother's. C████ exited the police vehicle, walked past Mother's house, and over to Fireside.

On November 14, 2013, Father took C████ to meet with his therapist, John Moyer, and invited Mother to attend. Mother did not attend, and on November 15, 2013 Father took C████ to school at Neshannock. After school on that day, C████ went to Fireside. Father emailed mother with the information as to where C████ was and invited her to go pick up C████, with Mother directing that Father bring C████ to her.

On November 18, 2013, C████ got off the bus from school, walked passed Mother's house, and went to Fireside. Father emailed Mother as to where C████ was. The same thing essentially happened on November 19, 2013, and again on November 20, 2013, and again on November 21, 2013. On Friday, November 22, 2013 C████ went to Mother's after school. That day was a custody exchange day for C████ to be returned to Father.

C▓▓▓ called Father and said he would walk over to Fireside because Mother was refusing to drive him over. Father could hear yelling in the background. Father went to Mother's home, with police present, and C▓▓▓ came out of the house and got into Father's car and Father and C▓▓▓ returned to Greensburg.

On Sunday, November 24, 2013, Father states that he made an effort to return C▓▓▓ to Mother, had driven C▓▓▓ to Lawrence County from Greensburg, let C▓▓▓ out of the car at Mother's whereupon C▓▓▓ knocked on the door but there was no answer. C▓▓▓ then went to Fireside. Father sent Mother an email to inform Mother where C▓▓▓ was. Again, C▓▓▓ walked to Fireside on November 25, 2013. On Thanksgiving Day, November 28, 2013, C▓▓▓ was to be with Father for Thanksgiving. At 8:00 p.m., the exchange time, C▓▓▓ was dropped off at Mother's but C▓▓▓ walked to Fireside. The maternal grandmother followed C▓▓▓ back to Fireside in her car. Father returned C▓▓▓ to Mother but C▓▓▓ got out of the car and walked back to Fireside.

On December 3, 2013, the first day back to school after Thanksgiving break, after school C▓▓▓ again went to Fireside. The same scenario repeated itself for the rest of the week, whereby C▓▓▓ would go to Fireside instead of to Mother's residence. Father offered that C▓▓▓ could stay overnight Friday night and attend a counseling appointment with Mr. Moyer the next day. However, C▓▓▓ had gone to Mother's house after school but Mother was not there and the door was locked so

C█████ went to Fireside. Mother did not come to Fireside to get C█████.

On December 8, 2013, C█████ again went to Fireside after school. On that day, Father received a telephone call from Officer DeWitt of the Neshannock police advising that Mother had gone to the police station about 8:00 p.m. to report C█████ as a missing child. At the time, C█████ was at Fireside. This pattern continued through the week. On December 11, 2013, C█████ went to Fireside but that evening he had a band concert at Neshannock Junior High school. Mother attended the concert also. C█████ left the band concert with Father. Father contended that Mother had left without C█████ as C█████ was supposed to stay with her that night. As with each of the foregoing events, Father documented all these matters with emails.

Father gave testimony that explained the same pattern of C█████ going to Fireside until December 16, 2013. On that date, C█████ did go to his mother's. C█████ was on the phone with Father talking about a school project. Father could hear Mother in the background making comments. Family members came to Mother's home that evening. Afterwards, Father explains that C█████ began to feel uncomfortable and called him saying that he was afraid to stay the night and was going to run. Father states that C█████ called him at various times during the night until a time close to midnight when he called one last time asking if Father felt sure that he would be ok. The next morning Mother drove Conner to school. The next day, C█████ did

not go to Mother's but went again to Fireside. On December 17, 2013, when C▮▮▮▮ went back to Fireside, he announced that he was never going to his mother's again.

Father's subsequent testimony continues with the same ritual of C▮▮▮ continuing to end up at Fireside. On Christmas Day Conner went up to Mother's door, had a brief conversation with Mother, with the result that C▮▮▮ left and went to Fireside.

On January 1, 2014, C▮▮▮ was dropped off at Mother's. C▮▮▮ left Mother's and went to Fireside. This time Mother drove to Fireside following C▮▮▮. He got into Mother's vehicle. They drove back to Mother's home. He got out again and returned to Fireside a second time. Mother and maternal grandmother followed C▮▮▮ back to Fireside again. After an exchange, C▮▮▮ got back into the car. Mother did not return to her home but drove in a different direction with the result that, at a traffic light, C▮▮▮ exited the car. Mother tried to stop C▮▮▮ with the result that C▮▮▮ ripped his pants, but C▮▮▮ was able to exit. C▮▮▮ hid behind a convenience store, called his father, and was in fact picked up by Father. The police arrived shortly thereafter. Father then filed the foregoing referenced PFA in Westmoreland County, which was dismissed. As a result of the PFA proceedings, Mother could have no contact with ▮▮ C▮▮▮ until the PFA was dissolved on February 5, 2014.

On February 5, 2014, Father dropped C▮▮▮ off in the driveway of Mother's home, and C▮▮▮ immediately ran to

Fireside. Thereafter, the same process continues whereby C█████ refuses to stay at Mother's, and after school upon being dropped at or near Mother's home goes directly to Fireside with Father continuing to document to Mother by email where C█████ is located. At each scheduled custody exchange thereafter, the same pattern continued whereby C█████ would be dropped off at Mother's, Conner does not stay, and goes to Fireside. On many of these occasions, Mother would not be at home. All of these incidents whereby C█████ is dropped off and does not stay are documented by Father in emails. This circumstance had continued up until the time of the most recent court filings. During all this time, according to Father, Mother does nothing with respect to C█████'s needs as it relates to education, health care, or extracurricular activities.

No contact occurred between Mother and Father relative to C█████ and Mother had no contact with C█████ during the summer of 2014. Father initially thought it might be beneficial to enroll C█████ in Cyber School in the event that things changed but eventually decided to enroll him in Hempfield. Father invited Mother to a band concert at Hempfield on October 27, 2014, but Mother did not attend. Mother has not participated in any activities at the Hempfield school. Father testified to C█████'s exceptional performance at Hempfield and his being engaged in various extracurricular activities from which he has benefited. C█████ is in the eighth grade, and is in advanced classes. Mother has consistently refused to sign any documents relating to C█████'s education at Hempfield.

53RD
JUDICIAL
DISTRICT

ᐯRENCE COUNTY
ᐯENNSYLVANIA

23

Mother testified that she is five feet, two inches in height and weighs approximately one hundred thirty pounds. Father is approximately six feet, two or three inches in height. Mother denied that she has ever threatened to shoot Father or to have ever heard him make that allegation in the past. In fact, she has never touched a firearm in her life. On the other hand, Father has threatened her. In 2012, Father told Mother that she deserved to die. She just learned in the course of these proceedings, the day before her testimony, that Father was carrying a loaded firearm at the custody exchanges. Mother testified that she has never done anything to C▬ in words or deeds that in any way conveyed that she would harm him and in fact she has never physically harmed him.

The mother described the standard exchange since October 1, 2013 by explaining that Father pulls into the driveway; C▬ comes to the door, either ringing the bell or knocking; Mother opens the door; C▬ holds up his phone and records, stating "I am just here to tell you that I am not staying"; C▬ then walks through the front yard between the houses and through the back yard holding his cell phone up the whole time recording and walking over to the Fireside residence. Father sits in the driveway for a minute and then backs out and drives over to Fireside.

Mother is employed as a dietician. Mother has never used illegal drugs, although she has been accused of such by Father. Mother denies that she has abdicated her responsibility as a parent. She did not see any need to respond to an email where

53RD
JUDICIAL
DISTRICT

RENCE COUNTY
NNSYLVANIA

24

Father wanted C████ to be in cyber school because C████ was already enrolled in Neshannock where he had always gone to school and where he had done very well. While in Neshannock his grades where A's and he engaged in activities such as soccer, baseball, took flying lessons and played a musical instrument. Mother noted that C████ had taken flying lessons since he was about ten years of age. The maternal grandfather would often take C████ to the flying lessons as C████ enjoyed a close relationship with, until the flying lessons were stopped about a year ago at Father's insistence. C████ was very interested in the flying lessons and Mother would participate with C████ in the lessons as part of it included classwork with which Mother helped C████.

Mother noted in her testimony that when Father calls and spends long periods of time with C████ on the phone, C████ will thereafter be distant, reserved and avoid her. When C████ is out of his father's sphere of influence then he is good and that he is happy, engaged and interacts with Mother such as wanting to watch a movie. C████ is very involved with his friends when he resides with Mother. Mother denies that she had no plans for C████ for school as the reality is that C████ is to reside at her house and he would normally go to Neshannock at the start of the school year just like he has done every other year. There is no reenrollment process to continue at the same school. She found out that Father had made other school plans for C████ by called Neshannock on the first day of school and learning that he was not there. She does not go to C████'s

functions at Hempfield because she does not feel that it is wise to be near Father, as she is deathly afraid of him. She cannot sign forms verifying any reading assignments as she has not been able to interact with Conner or to even speak to him about it. She testifies that she can't sign a form saying that C███ has read something when she does not if he truly did it. She has not had the interaction with C███ because C███ does not come to her house.

Her response to Father's claim that he complies with the order by bringing C███ to her house every other Sunday at exchange time is that she is normally there although she is not there every single Sunday because some Sundays he comes and some he doesn't and in fact she knows that C███ will not stay but will simply come to her door and say terrible things; things that she knows he does not want to say but he will record her on his phone for him to tell things such as telling Dr. Chambers that she had answered the door naked, which was false. She does not go to Fireside to pick up C███ after he leaves her residence because she knows that C███ is not going to come with her. The last time she tried to go Fireside before January 1, 2014, she was greeted by the police and was told she was under arrest for trespassing. She does not feel comfortable attending sessions with Mr. Moyer as she feels that he is manipulated by Father. When she did show up at appointments scheduled for her by Mr. Moyer, Mr. Moyer falsely asserted that the appointment had been changed even though her appointments cards show the correct date. When she showed up for her

orthodontist appointments, she would find out that Father had cancelled the appointment. The orthodontist refused to see Mother without Father being present. Afterwards, she would be accused of not participating. Mother also referenced disturbing photos on Internet on Dr. Moyer's website that appear to have pages of young girls with inappropriate names.

Her explanation of the occurrence on November 7, 2013 was that C▓▓▓ left her house about 9:30 in the evening after everyone, including C▓▓▓, had gone to bed. There had been no issues that evening. About 9:30 on the 7th, C▓▓▓ got up to use the bathroom, and took of down the steps and straight out the front door wearing his pajamas. There had been no interaction with C▓▓▓ from the time he went to bed until he left. He did have access to a telephone. Issues had previously risen with respect to C▓▓▓ using a telephone to have conversations with Father. Generally after he would hang up the phone with his Father he would have a tantrum. Approximately two years ago, after a conversation with Father, C▓▓▓ hung up the phone and then began screaming saying that Mother was going to kill him. On this occasion, after C▓▓▓ ran out the door in his pajamas, Mother called the police because it was dark and 20 to 30 degrees in temperature. When C▓▓▓ would leave her home previously, he typically would go to Fireside. The police eventually contacted her and asked her to come to the police station, which she did. At the police station, she was met with two police officers who advised that C▓▓▓ was in Cranberry with Ms. Sichak. She then received an email from Father who

advised that he had C███ and would put him to bed. She did not at that point try to pick up C███ because she did not want to be accused of abusing him, beating him, dragging him or that kind of thing. She next saw C███ at the police station the next day but C███ refused to come home with her.

Mother is of the opinion that the situation can be rectified if Fireside drive taken out of the picture and that the interaction with Father and Ms. S███ needs to be eliminated or stopped, and if that were the situation, C███ would be back to his old self within a week or two.

Mother notes that when the October 1, 2013 Order came out there were approximately two solid weeks that C███ did not have to go to Greensburg and C███ was fine with the situation. When it was time for her take C███ to his father's he was not in any hurry to go and in fact did not want to leave before the required time and referenced that he had bad stomach ache and didn't feel good.

C███ was returned to her on Sunday, and he was fine through the week. Everything was fine until the event of November 7, 2013. Before that, C███ was warm and affectionate, they did things together, he had friends over and he was doing well at school.

Mother denies cursing, screaming and saying derogatory things while he would be on the phone with Father.

Mother did not see C███ on his last birthday, February 10, 2014, because C███ doesn't come to her house. The last time she saw C███ before his birthday was January 1, 2014.

Mother has his birthday presents and his Christmas presents and he will get them when he comes home.

Mother does not go to the Hempfield school activities because she is fearful of Father and Ms. S████.

Mother went to the last Christmas concert at Neshannock although he was supposed to be at her house but was not. Mother did not see C████ over the Christmas holidays of 2014 at all. C████ says to her when he is dropped off that he just doesn't want to stay; that he can't stay; that he is not going to stay here; and that he is afraid of her. He speaks like a robot, holding his phone recording, stating "I am afraid to stay here, I am not staying here, I am afraid to stay here." She indicated that she has never seen another human being act that way.

At the Christmas concert she went to the band room to say hello to C████ but he would not even look at her.

Mother testified that he has never authorized C████ to be at Ms. S████'s house on Fireside nor to be living with Father at Greensburg other than the time called for in the custody order. Mother has not authorized C████ to be enrolled in the Hempfield School District.

On January 1, 2014, C████ was dropped off at 8:00 p.m. by Father. Father pulled out of the driveway and left. C████ walked through the yard and went to Fireside. The maternal grandmother then picked Mother up in her car and they followed C████ to Fireside. As they were following C████ in the car, they attempted to talk to him and he eventually got into the car. They pulled back into Mother's driveway; but as soon as

they did, C████ opened the door and took off again towards Fireside. Mother and maternal grandmother followed C████ again. They went back to Fireside. C████ went back into the front door and was there for a minute and then Father came out of the neighbor's house and went into the Fireside residence. C████ then came back outside and got into the car. They traveled out of Fireside and attempted to go to the home of Mother's girlfriend. When they got to a red light, Mother heard C████'s seatbelt unclick and feared that C████ was going to jump out of the car. Mother told maternal grandmother to go so that C████ would not be able to jump out. C████ opened the door and Mother turned to grab his leg so that he would not jump out. C████ yanked his leg and his jeans ripped and C████ jumped out of the car. Mother then called the police. Grandmother turned the car around and they attempted to look for C████ but could not find him. C████ was later found at Fireside. Father was at Fireside when C████ turned up there.

Mother learned that C████ had told his father that he wanted to stab her when she received medical records from Dr. Stroyer, C████'s physician, which indicated that C████'s statement that he wanted to stab Mother was made approximately one year prior to the time that she obtained the records. Father had never talked to Mother about that statement. At the time the statement was to have been made, C████ had been coming to Mother's house and having regular contact with her. The record actually indicated that Father had made that report to Dr. Stroyer, not C████.

On December 16, 2013, C▓▓▓ got off the bus and walked into Mother's home. C▓▓▓ had not been with her for over a month prior to December 16. On December 16, 2013, C▓▓▓ did his homework. It was a family member's birthday. After C▓▓▓ did his homework, he played a video game. Mother's niece and nephew were over and C▓▓▓ interacted with them and with the maternal grandparents. C▓▓▓ was his old self and was fine with Mother. He was warm, affectionate and loving. C▓▓▓ spent the night at Mother's on December 16, 2013. The next morning, Mother drove C▓▓▓ to school. He was fine. Mother asked C▓▓▓ if would be coming home after school and C▓▓▓ said "Yes". However, C▓▓▓ did not come to her home after school that day and the next time Mother saw C▓▓▓ was on January 1, 2014 when the unfortunate incident with C▓▓▓ jumping out of the car occurred.

Mother tries calling C▓▓▓ on the phone but he doesn't answer.

C▓▓▓ has a pet at Mother's home. It is a dog named Rex. C▓▓▓ always had a good relationship with Rex. Rex slept on the bed with C▓▓▓. However, when C▓▓▓'s relationship with Mother began to deteriorate, his relationship with Rex also deteriorated.

Mother denied ever being unclothed at any time that she had opened the door for C▓▓▓. She also denied that a video exists showing that she had no clothes on as the time being referenced was the time when she answered the door and had a nightgown on.

Mother explained that she and the maternal grandfather stopped taking C███ to the flight lessons after C███ accused her and the maternal grandfather of bashing his head off the wall or otherwise attacking him in November of 2012.

When asked why Mother has not attended to any of C███'s needs, physical, mental, educational or otherwise, Mother responded that it is because C███ will not talk to her and will not come to her house.

Delores DiCola, the maternal grandmother, testified that C███ was a perfect child until things began to change in 2012. The change in C███'s attitude coincided with long telephone calls from his father. These telephone calls would be hours long.

Before the phone calls C███ would be his normal loving self and then afterwards he would become sullen, non-talkative and belligerent.

The maternal grandmother also described the times that C███ would be dropped off at the custody exchange and would not stay. She described that C███ would get out of the car, not even come to the front door, go to the right of the garage and around to the back of the yard up to the next street and towards Fireside. The entire time he would be holding his phone video recording the event. At times the maternal grandmother would yell out that she loved him and needed to see him and he would just keep videoing and keep walking. The maternal grandmother noted that in the last few months he started coming to the door. He would open the door, or ring the doorbell or

knock, and he would just state that he was not staying and leave. C▇▇ is now different in that he won't talk, he stares and continuously videos.

The witness also corroborated Mother's testimony as to C▇▇ being fine for the two-week period after the October 1, 2013 custody order was issued and was sullen when he had to be returned to his father.

The witness then described seeing him on December 16, 2013 when he came to Mother's house and stayed. It was the birthday of maternal grandfather and a party was held. C▇▇ was fine, he interacted with his cousins and played video games. The witness did not see C▇▇ again until January 1, 2014. The witness then corroborated Mother's version of what occurred on January 1, 2014 when C▇▇ kept leaving Mother's residence for Fireside and eventually jumped out of her car when stopped at a stop light.

The witness testified to the close relationship that C▇▇ enjoyed with her husband, wherein C▇▇ referred to him as "Pop". They did everything together and went everywhere together. C▇▇ would rather be with "Pop" than with anybody. Things changed after the incident that led to the PFA and the accusation that her husband supposedly beat his head on the wall or that he attacked him. Since that time, the maternal grandfather has seen C▇▇ only a couple of times. One time was the birthday party of December 16, 2013.

When Father retook the stand, he described his version of the events of December 16, 2013, wherein he related that he had

received a series of telephone calls through the evening from C▬ distressed and threatening to run away from his Mother. Father stated that he was able to get C▬ calmed down but after that he flatly refused to return to his mother's.

On January 1, 2014, he was able to persuade C▬ to go with his mother. After the January 1, 2014 event wherein C▬ had removed himself from the maternal grandmother's vehicle, C▬ consistently refused to return to his mother.

He summarized that he continued to take C▬ to Mother's home for the custody exchanges but eventually Mother even stopped being at home.

Father testified to informing Mother of all school activities but she has chosen not to appear at any of them. She was specifically informed of C▬'s band concert held on December 9, 2014 and she did not appear.

Father continues to take C▬ to Mother's home for the custody exchanges. She is generally not there, and he confirms having brought him there with an email each time.

On November 23, 2014, C▬ was dropped off and Mother and maternal grandmother were there, there was some discussion at the door and C▬ left, going back to Fireside again.

The last custody exchange before the hearing of January 12, 2014 was on January 4, 2014. Father brought C▬ to Mother's home. Mother was not home and they returned to Greensburg.

Father testified that he encouraged C▬ to have contact with his maternal grandmother. C▬ is adamant that he will have no contact with his maternal grandfather. C▬ sent the

maternal grandmother a card inviting her to lunch at the Olive Garden in Cranberry on a Saturday in December, 2014. The maternal grandmother responded with a text message indicating that she would look forward to lunch. The lunch meeting between C███ and his maternal grandmother did occur and by all accounts, both enjoyed it.

Father testified that C███ continues to excel in school and is starting to switch over from trumpet to playing the tuba. In addition to his band activity, he is in Boy Scouts. Father described C███ presently as happy, getting along well in school, getting along well with his friends, and that he is one of the most pleasant kids you could meet. He is helpful around the house and does chores. He excels academically. He no longer has the panic attacks that he used to have while at his mother's house.

The maternal grandmother retook the stand and testified as to the luncheon that she had with C███. It was in November, 2014 before Thanksgiving. C███ sent her a card in the mail inviting her to go to lunch with him in Cranberry. The card requested that she RSVP by phone. The card indicated that just she should go. She responded that she would meet him at the Olive Garden in Cranberry at noon on the appointed Saturday. He was by himself and the luncheon lasted one hour. The maternal grandmother attempted to bring up the mother but C███ said he was not there to talk about his mother. C███ did ask about his dog, Rex. The luncheon ended well. Father picked C███ up after the lunch. The maternal grandmother and C███ agreed

that they would possibly do it again but C███████ was to get in touch with her if he wanted to have lunch again.

On or about December 13, 2014, maternal grandmother sent C███████ by text a picture of her puppy. C███████'s response was to question whether Mother stole another dog from another boyfriend. Grandmother responded that was not nice and that C███████ had hurt her feelings. Grandmother next sent another response saying "what happened to the C███████ I knew? You are certainly not him." Further response from C███████ included the statement that "The C███████ you knew, he has grown up and is thinking for himself. I am not going to let anyone abuse me."

The maternal grandfather, John DiCola, Jr., testified that he had a good relationship with C███████ from the time he was born until about October or November of 2013. He and C███████ did many things together including go on vacations together. C███████ was interested in the maternal grandfather's hobby of restoring Jeep vehicles and worked together in the garage often. He and C███████ took flying lessons together. The witness testified that he loves C███████ and there is nothing that he wouldn't do for him.

The witness has not seen C███████ since December 16, 2013. Mother had a party at her house with the other son and his children and some friends and C███████ was there. C███████ was fine. They had cake and ice cream. The maternal grandfather has not had any contact with C███████ since that time. After that, C███████ was different. He was fearful and not the same young man that he knew a month earlier. The witness indicated

53RD
JUDICIAL
DISTRICT

ᴸENCE COUNTY
ᴺNSYLVANIA

that C███ seems to be replicating his father's personality and mannerisms.

The maternal grandfather was also asked about the events of November 25, 2012 which led to the PFA proceeding against him that was dismissed. The witness explained that he was at home when Mother called him and asked him to come over to the house. He could hear that C███ was screaming. When he arrived, C███ran into his bedroom and was screaming. C███ was screaming "Don't come near me--you're going to kill me." The witness pushed the door open and he was holding C███'s legs while Mother was holding C███'s arms. C███ was flailing all over the place and his head was bouncing on the carpet as he was flailing. The whole event took about five minutes. Before this event, there had never been any confrontation in any way between C███ and his maternal grandfather. That very same night, C███ calmed down. He stopped his ranting and flailing and the witness let go of his legs and Mother let go of his arms. C███ went to the bathroom, then came out and said he was hungry. He ate a bowl of cereal and then went and sat on the couch. The witness and C███ then had a discussion about a new Jeep vehicle that the witness had purchased and asked him if he would like to take a ride in it after school on Monday night. C███ said, "That would be good", and the next night they did take a ride to the Hermitage Dairy Queen and got ice cream.

Raymond Killen testified. He is the guidance counselor at Wendover Middle School, which is a part of the Hempfield School District. On the first day of school, C███ came to his office

and wanted Killen to know that he was living with his dad and he was worried that he was not going to be able to continue living with his dad. The witness also teaches a guidance class that meets one out of every six school days. The witness also assisted C███ when he was dressed as a school Spartan for Open House. C███ is doing fine in his class. There is a nice group of kids that C███ is friends with. C███ is doing very well in school. He achieved distinguish honor, which is ninety-six percent grade point average or higher and he is on track to do that for the second term as well. The witness had made notes of what C███ had said to him about what is going on with him at home. The notes indicate that C███ said that he lives with his dad but mom is fighting for custody; that he does not want to live with mom; that she has become violent with him, screaming, calling him stupid, tackling him when he tries to call his dad and that CYS has been involved and has done nothing. The notes further indicate that the maternal grandfather broke down the door to his room and tackled him and has hit him.

The witness did indicate that he found it somewhat unusual that C███ came to him to explain what was going on with him on that first or second day of school because C███ did not yet know him and did not at that point have a comfort level with him.

Robert Raymond Kollar testified. He is a teacher in the same middle school as Mr. Killen. He teaches American History and C███ is one of his students. Conner is doing "superb" in

his class. He scored a ninety-eight percent the first quarter and will get a ninety-nine percent for the second quarter. He is polite and he is willing to add to the conversations that involve dialogue over historical topics. He asks a lot of questions and seems to be enjoying the class.

Dr. Bruce Chambers, a licensed psychologist, was appointed by the Court to perform a custody evaluation and was called to testify. Dr. Chambers has impressive qualifications having performed over 600 child custody evaluations and is involved in training child psychology fellows at University of Pittsburgh. He has provided expert reports and testimony in a number of courts in the Commonwealth of Pennsylvania. He holds a Ph.D. in Human Ecology but not in Psychology. At present, Dr. Chambers does not have a clinical practice, only performing forensic work.

In performing his evaluation, Dr. Chambers met with and observed Mother, Father, C██████, and Ms. S██████. He also reviewed the three previous custody evaluations that were conducted in this case. He conducted psychological tests of Mother and Father and found no evidence of psychopathology, although he did find that both parents have personality traits that compromise both parent's capacity to cooperate and to work in the child's best interest.

Dr. Chambers found credible C██████'s statements to him that Mother had a temper and expressed her anger and had been abusive toward him through the years, causing C██████ to have trust issues with Mother and further noting that Dr. Moyer had

indicated to him that there were challenges with trust between C█████ and his mother and dealing with Mother's anger and explosiveness. Dr. Chambers stated that the anger and explosiveness of Mother is emotionally stressful for C█████. Dr. Chambers also testified that C█████ is doing well because of the lessening or removal of the stress given his current situation, in that being removed from the stress has helped to stabilize him emotionally and in other ways as well. Dr. Chambers did not interview C█████ with Mother as he felt that would have been a stressful situation for C█████ and he wasn't seeing C█████ in a therapeutic setting. Dr. Chambers' opinion is that a reintegration occur between Mother and C█████, but in a very therapeutic setting. Dr. Chambers expressly stated that if C█████ were forced to be with his mother without reunification counseling, it would be a formula for disaster for C█████ at this point. Dr. Chambers referenced what C█████ had told him about what his mother said to him, making him feel guilty for his preference for his father and criticizing him for that, demeaning him and expressing anger toward him. Dr. Chambers referred to Mother's personality being more animated, again referencing what C█████ told him about anger outbursts and temper issues.

Dr. Chambers indicated that he did not find alienation because C█████ was able to talk about positive memories of his relationship with his mother and was able to talk about those things. Dr. Chambers indicated that when you have a child who has been alienated, you rarely see any positives being related

by the child. It is usually a black and white situation; one parent's all good, one parent's all bad. Dr. Chambers said that was not the case with Conner, he recalled some positive memories not only of his mother but his interactions with his grandparents as well, which lent more credibility to his statements about what had occurred. Dr. Chambers' recommendation is that Father be granted full legal and physical custody of C██████ and that there be reunification counseling with Mother.

On cross examination, Dr. Chambers conceded that it did not occur to him that the allegations made against Mother had no evidentiary basis and that the things that are being said about her now are bogus. Dr. Chambers also conceded on cross examination that if the things that C█████ says happened did not happen, then everything that C█████ is saying and doing can be the result of his father coercing him to do it; that if those things did not happen, such a conclusion would only make sense. Dr. Chambers also conceded that if C██████'s statements and expressed feelings are the product of his father's coercion, then such circumstance would be emotionally damaging as well. Dr. Chambers further conceded that if all of the behaviors that C█████ has related to a number of professionals throughout the years are total fabrications then there are serious issues with alienation. However, Dr. Chambers noted that he assessed for the usual alienation indicators and they are not there. Dr. Chambers further conceded that if C█████ is saying and acting in a way that is devoid of reality in that his running away from

41

his mother's house is simply a setup by his father and all of his manifestations are something that his father has put him up to, then that circumstance would be a bad situation for C████. Dr. Chambers further conceded that if none of the things that C████ says his mother was doing actually occurred, then that circumstance supports the hypothesis that the present circumstance is his father's manipulation, contrived in coercion. Dr. Chambers clearly found credible C████'s statements that he remembers his mother yelling at him and screaming, particularly around homework issues, that she did not have patience, that if he asked questions, after screaming at him, she would just do his homework and that the screaming and yelling escalated over time and eventually led to the squeezing of the arms and such things and that these issues had been going on for a long time. Dr. Chambers also concedes that the anger and the behavior issues that he attributes to Mother are all based upon what C████ has told him and what Dr. Chambers believes he has told others as well. Dr. Chambers further clarified that the major factor in his mind is Mother's reaction to C████'s desires to live with Father and also her other temper and frustration tolerance issues that Mother has had that has impacted the child. Dr. Chambers further noted that if he assumed hypothetically that C████'s concerns about his mother were unreasonable or an overreaction, that would affect his opinion about the effect of returning to his mother without a therapeutic setting, although the witness further stated that he does not think they are unreasonable. Dr. Chamber also agreed

42

with counsel for Mother that if C█████'s views are unreasonable and what he says about his mother are not true, that it would be absolutely essential for C█████'s short-term and long-term development for the cause of that view of his mother to be excised, to which Dr. Chambers responded, "Of course."

Dr. Martin Meyer had been appointed by the Court to conduct a psychological evaluation of C█████. Dr. Meyers testified that he is a licensed psychologist in the Commonwealth of Pennsylvania. Dr. Meyer administered psychological testing and his conclusion was that C█████ had no serious psychological problems. Dr. Meyer also stated that he could not rule out that C█████ was coached. Dr. Meyer also recommended that there be some kind of reunification process with counseling between C█████ and his mother. Dr. Meyer was not appointed to perform a custody evaluation but just to determine the mental state of C█████. Counsel for both Mother and Father asked Dr. Meyer a number of questions regarding his awareness of a number of specific events which the Court will not here recount in detail as the matters asked about did not form the basis of his opinion that C█████ was not presently suffering from any psychological issue.

M██ E██ S██ testified that she resides with Father and C█████ in Greensburg. She is employed as a nurse anesthetist. She has been in a relationship with Father for approximately ten years and they have resided together for approximately eight years. Prior to living in Greensburg, she resided at 130 Fireside Drive located near Mother's home. She

53RD
JUDICIAL
DISTRICT

'RENCE COUNTY
ENNSYLVANIA

is presently attempting to sell that home and has listed it with a realtor.

A normal day for her is to get up, get ready for work, usually make lunch for C███ but she leaves before C███ and Father leave. Father gets C███ off to school on most days. She generally is back home before C███ gets off the bus because she starts early. When C███ comes home he takes a break, gets a snack, and then gets to his homework right after that. She, Father and C███ have dinner together normally and either she or Father will do the cooking. She is aware that C███ is involved in extracurricular activities including Boy Scouts and band. Her observations are that C███ is happy, relaxed and doing well in school and has made friends. C███ refers to her as "M███ E███". She corroborates the testimony of Father that Father encourages C███ to go to his mother's house. She has attended C███'s extracurricular activities, including band concerts. From her understanding, Mother has made no attempts to contact C███ since January, 2014. She does acknowledge that C███ has the security access code to her Fireside residence and she does not intend to change that code so that C███ would not have access to it. The witness acknowledged that she believes that Father does believe that Mother is a physical danger to C███.

Mr. John Moyer, C███'s current therapist, testified as to circumstances under which certain photographs appeared on a website that he maintained. It was the witness's testimony that he had no control over these postings. The website related to

his hobby in photography. The website is an archive of his photography and some personal things as a way of getting himself known on the internet. He considers himself a semi-professional photographer. He does not make regular postings to this website. The witness indicated that he has no control of the pictures that come up randomly from the links on the website.

C▆▆▆ testified at length, in chambers, having been examined at length by counsel and to a limited extent by the Court. He is enrolled in the Hempfield Area School District, Wendover Middle School, in Greensburg. He has all A's except one B. He enjoys his classes and likes his teachers. He has close friends. He is in band, having played the trumpet but now switching to tuba. He is in Boy Scouts. He is in advanced honor classes. His favorite subject is History. He likes his teachers better now than his teachers in Neshannock and he understands better in Hempfield than he did in Neshannock. His teachers in Hempfield explain things better than the ones in Neshannock. At Neshannock they would just flat out tell him the only reason they're teaching him is so they can pass the PSSA's. The teachers at Hempfield actually tell students that they want students to learn and they want students to be taught and understand things.

He stated that he is now staying in Greensburg with his dad; that at his mother's house his mother would scream and yell at him when he was doing his homework; if he asked her a question or if he didn't understand it or couldn't do it fast enough, she would start screaming and yelling at him and

slamming her hands down on the table and swear at him and call him "stupid". However, his dad actually tries to explain things to him so that he can understand and finish the problem. He testified that his mother would swear a lot, call him an idiot and say "God dammit, C████, why the f-u-c-k can't you do the problem, things like that". He stated that that reaction made him feel sad and scared. On the other hand, his dad tries to explain the problem to him so that he can understand it. His best friend at Hempfield is a student that is also new to Hempfield and they hang out a lot. He also referenced other friends he has made at Hempfield. He has had concerts with the band, including a Christmas concert, a concert early in the year and a band festival. At Open House, he wore the costume for the school mascot. His mother did not attend the Open House or any of the band concerts. He has been active in Boy Scouts and has been on three camp-outs so far, and is working toward assuming a leadership position with Boy Scouts. When he lived with his mother, he wanted to be in Boy Scouts, which at the time was actually Cub Scouts, but his mother would not let him be in Cub Scouts. He described a number of activities that he engages in with his father and Ms. S████. He also testified that he considers where he is now to be a safe environment. He feels much safer with his father and Ms. S████ than he did with his mother. He is afraid to be with his mother. He now feels less stress with his dad, especially when trying to do a problem or helping his dad with something than when he was with his mother.

53RD
JUDICIAL
DISTRICT

▪RENCE COUNTY
▪ENNSYLVANIA

46

In describing what it was like to be with his mother, he stated that he was afraid to be with her. There was lots of screaming and yelling. He stated that before the custody trial in 2013, she had stopped being angry and was very nice and she bought lots of things for him, but after the order came out from the custody trial she became very hostile and scary and threatening. She would say "I am going to get you. I'm going to get you and your dad. I am going to hurt your dad. I'm going to hurt you." C▇▇▇ then testified that she has a voodoo doll she has hanging in the kitchen which she has explained to him very clearly as being his dad, and she would take the doll and slam it in drawers and stab it and throw it on the floor and scream at it and recently hung his picture next to it. Triggering events that would cause Mother to act this way would be if C▇▇▇ would tell her that he wanted to live with his dad, or if any subject about his dad came up, or if he would call his dad. C▇▇▇ testified that he would call his dad because he was afraid of his mother and kept telling her that he wanted to go to his house. He testified that he wanted to run away from his mother's house and his father kept trying to calm him down, saying "Everything is going to be okay, just calm down, everything is going to be okay, you can stay there, it's going to be fine, nothing is going to happen." C▇▇▇ stated that he would call his dad all the time especially a lot of the times when he would have a hard time sleeping because he was afraid of what his mother would do while he was sleeping. Sometimes he would call his dad late at night because he couldn't sleep and

was afraid. Mother would get angry at him when he was calling his dad. She would order him to get off the phone with his dad. On one occasion when he asked if he could live with his dad as he did not want to live with her anymore, she said "Fine, call your dad." When he pulled out his phone to call Father, she attacked him for the phone and actually knocked the wind out of him and he fell to the ground. He was trying to get the phone to her because she rushed at him, but he couldn't get it out of his hand fast enough and she knocked the wind out of him. When he was younger, she would wrap her whole hand around his arm and would squeeze it until he started to cry, and then let go and laugh. When he is at his mother's he has panicky feelings, his heart starts to race and he feels scared. He feels like he needs to run but his legs get numb. He then calls his dad who tries to get him calmed down and usually it works. He kept thinking that his mother was going to hurt him.

In reference to the event of November 7, 2013, he ran away because he was afraid of his mother because she had been screaming and yelling and slamming her hands down on the table. He was very scared and could not get calmed down so he ran. He stated that he ran multiple times, at first to Fireside, but when his dad said he couldn't run to Fireside, he knew he couldn't stay with Mother so he ran to the police station. He would tell the police that he couldn't stay with his Mother because he was afraid she was going to hurt him. The police tried to take him back to his mother's, but he said he wasn't going to go back and he wasn't going to stay and on one occasion

53RD
JUDICIAL
DISTRICT

:ENCE COUNTY
NNSYLVANIA

he was placed in the Krause Shelter. Father picked him up from Krause the next day.

After the October 1, 2013 custody order came out, he stayed with his mother until early November when he began to run away. However, Mother had become more hostile and getting more scary and ramping up, especially when he was talking to his dad to try to get himself calmed down. She would try and get him off the phone in multiple ways which caused him to become more panicked.

C▆▆▆▆ explained that on November 8, 2013, he told the guidance counselor at Neshannock he wasn't going to go back to his mother's house after school because he was afraid that she would not take him to his dad's house like she was supposed to. C▆▆▆▆ also spoke about an incident that occurred on November 13, 2013 where the police tried to return C▆▆▆▆ to his mother's house and he bolted again and ran back to Fireside. Each time he ran to Fireside, Mother never came to get him. C▆▆▆▆ testified that his father always told him that he was supposed to stay with his mother.

C▆▆▆▆ would routinely ride the school bus to his mother's house but then he would get off the bus and walk to Fireside. Neither his mother nor his grandparents would ever greet him at the school bus. In November of 2012, the Sunday after Thanksgiving, he came home from school and told his mother that he wanted to live with his dad. Mother became angry and started yelling at him and called her dad to come down. C▆▆▆▆ saw his grandfather's car pulling into the driveway so he ran up to his room to hide and closed the door and pushed himself against the

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
ENNSYLVANIA

door. His grandfather came up the stairs, kicked open the door, and tackled him to the ground. He grandfather then sat on him, held his arms down and kept slamming his head off the ground probably three or four times. Mother came into the room and sat down to watch. C██████ stated he kept screaming for help. The next day they were at the grandfather's house for dinner, and the grandfather took C██████ for a ride in the new Jeep and they went to get ice cream. C██████ did not want to say "no" because he was afraid of what would happen if he refused. After that, Mother usually cooked dinner at her house and they usually do not go to grandfather's house for dinner any more. The last conversation he had with his grandfather was one where he had run to the police station. His grandfather had come down to talk to him and he said "Why are you afraid of me?". Conner said, "Well, because you attacked me." Grandfather said, "No, I didn't". Grandfather started getting really angry and yelling at him. Grandfather closed the conversation by walking out of the room and saying "You're just a worthless piece of shit then." C██████ states that that is the last thing his grandfather has ever said to him.

C██████ stated that he would video the exchanges where he was dropped off at this mother's house for two reasons. One, he feels much safer when he records because he does not think his mother will do anything bad if he's recording and also that if he doesn't have a recording for exact proof, he doesn't remember every second of the event then people will think he's lying. He figures that if he takes a recording then he can just play the

53RD
JUDICIAL
DISTRICT

▼RENCE COUNTY
ENNSYLVANIA

.50

recording in court if something happens. For proof purposes, he recorded each one of the events. C███ explained that his dad would drive him into the driveway, he would get out of the car, he would have his recording on his phone, he would walk up to the door, knock on it, say that he's not staying and then leave. There were many occasions where his mother wasn't there for him to actually say that he was not staying so on those occasions he would just get back in the car. C███ states that on these occasions she never did anything to encourage him to stay.

On January 1, 2014, he was scheduled to go back to his mother's house so his dad drove him to mother's and dropped him off. He walked away past her house and his mother and grandmother got into the car and followed him. His grandmother was driving. His mother was in the passenger seat. C███ got back into the car. They drove back to the house and he got out of the car again and ran, and got back to the road leading to Fireside. His grandmother and mother followed again in the car. They said things like "The judge can't wait to hear this. You're going to go to Krause. You're never going to see your dad again. They're going to put you in foster care. The judge can't wait to hear this." When he got back to Fireside, his father told him to get back in the car. C███ got back into the car and his grandmother started driving again. He noticed that his grandmother had not made the turn that would take them back to Mother's house. He asked where they were going and his mother said she didn't know. Mother then said they were going to look at Christmas lights. C███ felt that his mother was

53RD
JUDICIAL
DISTRICT

ᴵRENCE COUNTY
ᴇNNSYLVANIA

51

lying about where they were going so when they got to a stop light near a convenience store he unbuckled the seatbelt and tried to get out of the car. He got the door a little bit opened when his mother grabbed his pants pocket and said "Go, go, go, he's getting away, run the light, run the light", at which time his grandmother stepped on the gas while he was hanging halfway out of the vehicle, running through a red light, with his grandmother driving. He tried to pull himself back into the car but with the force of the slamming on the gas he got stuck and couldn't lift himself back into the car. Halfway through the intersection, his grandmother slammed on the breaks and he fell out of the car and he ran behind a shed near a local house and called his dad to come and get him.

Conner then spoke to videos that were played in chambers, showing Mother's front door, him trying to open it but it was locked. His dog, Rex, can be heard barking inside the house. C▓▓▓ referred to Rex as Mom's ex-boyfriend's dog that she took and kept. C▓▓▓ states that Rex is not his dog and is not his mother's dog either and that he is afraid of him. Rex would stay on his bed when he slept but if he were to bump him in the middle of night or did something he didn't like, he would kind of turn and snap at him and growl and snarl.

Next, a video was played where he is in his mother's home on her landline phone, which is on speaker phone with his dad. He identifies the video taking place on December 16, 2013. C▓▓▓ explained that he had an iPhone that was given to him by M▓▓ E▓▓ as a hand-me-down. Mother took the phone away from

him and hid it. The phone he is using to record the video is his first cell phone that he had. He is recording with the cell phone and talking with his father on the speaker phone because Mother said that if he wanted to talk with his dad on her phone that he would have to have the speaker on. December 16, 2013 was also the day of the grandfather's birthday party. C█████ pointed out the voodoo doll in the video. C█████ said that his mother had told him previously that it represented his dad and it wore scrubs like his dad does. C█████ again stated that she would scream at that doll and stab it and slam in drawers and say "Why don't you die?".

In describing the events of December 16, 2013, C█████ stated the reason he was on the phone with his dad originally was that he was doing a school project which was to name some of the family traditions that you do, so he asked his dad about them. He had been running away but he went back that day. He went back because Dad kept saying he needed to go back to his mother's house. Therefore, he gave in and went back to his mother's house for that one day. It was his grandfather's birthday, but he was not aware of that until several days later. After the video, he went downstairs and played videogames and people started arriving but he did not go upstairs. He tried to avoid everyone and basically stayed downstairs the entire time. He went up one time for something to eat, but afterwards went back downstairs to eat. He did sleep over that night, was panicked and could not sleep and did not fall asleep until probably after 1:30 a.m. He was on the phone with his father

until 1:00 a.m. on and off. He described his breathing as shallow, breathing really fast, his heart was racing and his throat was throbbing and his face got real hot. The next day he went back to Fireside and did not return to his mother's house. He continued to go to Fireside from the bus.

The next video is the one where he indicates that mom appeared at the door undressed. He describes that he is holding the camera, and his head is further left of the camera. He can see around the door and could see most of the right side of her body. He could not see any clothes on her shoulder or anywhere around her neck or anything and saw the top part of her chest, the side of her chest and the inside of her knee and leg and there were no clothes on any parts of her body. He stated that he was completely startled when she answered the door naked. C███ says to her that I'm coming to invite you to go to counseling with me. He gave her an exact date and time that she was to go to counseling with him. The date of this event is November 23, 2014 (obviously meaning 2013 given the timeframe of events).

C███ stated that his mother was never willing to go to counseling with him, his dad encouraged him to reach out to Mother in other ways such as going to lunch or just talk on the porch. He does describe the lunch with his grandmother as a pleasant event. At the end of the lunch he told his grandmother that if she wanted to have lunch again she could send him a text or call him and he give her his phone number. After that

neither his mother nor his grandmother ever invited him to go to lunch again.

C█████ references a series of text messages on his cell phone where he invites her to engage in counseling with him. He states that he she has never responded to any counseling requests nor showed up at any offered time for counseling. When she does respond she just states "I love you very much, C█████."

C█████ stated that he does not think he is safe at his mother's house and he does feel safe at his father's house and his father does love him. He does not think that his mother loves him, she does not want him anymore, she just wants to hurt his father like she has said repeatedly. He says that he feels this way because she has hurt him before, physically attacking him. He referenced the event of his grandfather who "slapped my head off the ground, the time that she attacked me for the phone, the time she almost got me killed trying to drag behind me behind the car on January 1, 2014, I don't feel safe there because I don't think I am safe there." Shortly after the custody trial in 2013, she walked up behind him while he was sitting on the couch watching tv and said "I'm going to get you, I'm going to kill you." Earlier that day he had been talking to his dad on the phone and that made her angry. C█████ stated that if he were required to go back with his mother and the Fireside house was unavailable to him, he would run to the police station. He would not stay with her.

C█████ conceded that he told his father that he wanted to "cut" his mother. He concedes that he actually did want to do

that with a knife. He testified that he wanted to hurt her so that she would not hurt him anymore. He still feels that way, although he wouldn't do it. Father told him not to do that. C▇▇▇ has told his father that his mother wants to kill him and his father does believe his mother wants to kill him. C▇▇▇▇ believes that his father is afraid of his mother. He is afraid of his mother so he can understand why Father would also be afraid of his mother. She has threatened to kill him also. She has said so in front of him like yelling at him and saying "why don't you die?, I'm going to kill you with the voodoo doll, referencing Mother's habit of taking the doll, stabbing it, screaming at it, yelling at it, cursing at it and banging it in the drawer. He saw her do this the voodoo doll multiple times. She would stab it with kitchen knives. C▇▇▇ also stated that if his mother had come to Fireside to get him, he would not have left with her. He was at his mother's house as recently as two weeks before his testimony and she was not there, but if she had been there he would not have stayed. A month or two ago he was at her door and when she answered the door he told her he was not staying and that if she had been out on her porch waiting for him he would not have stayed although he would have talked to her. If he would have talked to her, he would have talked to her probably about coming to counseling. When asked to name one good thing about his mother, C▇▇▇ stated, "She buys me stuff." However, C▇▇▇ states that the flying lessons were just an attempt to bribe him. His grades went down with the more time that he spent with Mother that any good grades he got was

because of his dad; that mom wasn't doing anything that was good for him, helpful in any way, it was all his dad; and the only good thing was that she was trying bribe him for custody. His grandmother was not as much interested in bribing him but he feels that his grandmother is abused by his grandfather and his mother. They talk about how stupid she is and they make fun of her at the dinner table. He feels that his grandmother is stuck in an abusive situation just like he was. He dog Rex just got meaner as he got older. He also stated that his mother talked about being related somehow to Judge Piccione and that she owns Judge Piccione. C▬ again recalled the incident at the police station in 2013 when his grandfather told him that he was a "worthless piece of shit". C▬ believes the police officers heard him say that. However, C▬ then stated that they would have heard him but they walked out of the room and left him in the room alone with his grandfather. C▬ told his father about what his grandfather had said.

During examination by Mother's counsel, C▬ was shown the voodoo doll. C▬ acknowledged Exhibit HT-7 as being the voodoo doll. When asked to identify the stab marks and all the damage that was done; C▬'s response was that this could be a new one. C▬ could not identify any damage to the voodoo doll. His only explanation was that this could be a new one. C▬ was then shown a pack of keys and identified it as being the keychain with his picture on it. The keychain with his picture on it was what he was referring to when he said the picture was next to the voodoo doll. The voodoo doll was

hanging on a cabinet knob and the keychain with his picture on it was hanging on the next cabinet knob.

The Court attempted to examine C▇▇▇ relative to positive experiences that he may have had with his mother. C▇▇▇ referenced the plane lessons, and a trip to North or South Carolina where they went to a museum and a speedway. With reference to the speedway, his mother drove a racecar. However, C▇▇▇ qualifies the experience by saying that when she was with him it wasn't like she was with him 100% of the time. It was like 80% her buying him stuff and treating him ok and then she would come up and be angry and attack him and bad things would happen. When the Court redirected C▇▇▇ to flying lessons, the Court asked C▇▇▇ if Mother encouraged him to take the flying lessons, which was something that C▇▇▇ liked. C▇▇▇'s response was that he did not like the lesson part of flying. She encouraged the flying lessons but he really did not like the lesson part of it. He just wanted to fly the plane around and he didn't study for the lessons like he was supposed to. He acknowledged that he started playing the trumpet when he was at Neshannock and when asked if she encouraged him with the trumpet lessons, he responded, "No." He acknowledged that she did attend the concerts at Neshannock but she did not encourage him to practice on his own. In fact, she discouraged him from practicing. He stated that when he would get the trumpet out, she would say that she did not want him playing the trumpet there, that she did not want to hear that. When asked about athletic activities, he stated Mother would come soccer games

53RD
JUDICIAL
DISTRICT

�whatRENCE COUNTY
ENNSYLVANIA

58

when he was in second or third grade, but she did not come to basketball practices and they did not have actual games as it was intermural basketball training. When asked if there were any other things he could remember that he would consider in a positive way, he referenced going to the pool, but that his mom really didn't want to do a lot of stuff with him. When asked if he would have friends over the house he indicated "sometimes" but as his friends got older they said they couldn't come over because their parents did not want them around his mother because they said their parents said that his mom was scary.

The maternal grandmother, Delores DiCola, was recalled and testified that during lunch break she went to Mother's home and retrieved the voodoo doll. It was on the kitchen cabinet doorknob. In order to remove it she had to get a screw driver and hold the screw and twist it off. The voodoo doll has hung on that doorknob since 2005. She has never before heard anything about it being stabbed or smashed or damaged in any way. She has never heard or described or heard anybody reference the voodoo doll or the outfit as being scrubs or being representative of Father.

The maternal grandfather, John DiCola, Jr., also retook the stand. He recalled two times that he was at the Neshannock Township Police station. On one occasion he was at the municipal complex and happened to see C⬛ walking east on Shenango Road. He walked into the police station and called for the police. Mr. DiCola then walked over and asked C⬛ what

he was doing. C█████r said he was calling the police. Mr. DiCola then walked away from Conner at that time.

The next time he saw C█████ at the police station was when he had run away and the police had retrieved him and brought him to the police station. Mr. DiCola went to the police station and told an officer that he would be next door at the fire station if he was needed. A police officer asked him to come over and he did. The police were attempting to talk to C█████ and have him to go back with his mother, but he refused. There were two police officers in the police station. The police were attempting to call Father but they had not made contact with him. The police had said to C█████ "If you're not going with your mom, we can't get your father, so we'll have to take you to a shelter." Mr. DiCola left after that and when asked if he had called C█████ a "worthless piece of shit" he said, "Absolutely not" and has never said anything like that to him. The police officers were present at the police station during the entire time that he was with C█████.

H█████ T█████ retook the stand and explained that the voodoo doll is a keychain that she has had for ten or eleven years, along with other keychains. The voodoo doll keychain has been hanging on the doorknob in the kitchen until the day of her testimony. During the entire course of litigation she had never heard before of any allegation that she took the voodoo doll down and stabbed it with a kitchen knife or slammed it in a drawer. The voodoo doll was on the same identical key chain that's been hanging on her cabinet door for years. The first

time that she had ever heard that the keychain voodoo doll was going to be introduced into evidence was today at noon. She has never stabbed it with a knife or anything nor has she ever slammed in in a cabinet drawer. You can't even get if off of the doorknob as she had unscrewed the knobs to put it on. You cannot get it off and on the doorknob easily. She has never said anything about the voodoo doll keychain in reference to K███ or C█████. She has never referenced the fact that the outfit on the voodoo doll resembles scrubs that a physician such as Father would wear. She has never told C█████ that he was stupid, has never attacked him, has never said that she wished he were dead nor has she ever berated him or demeaned him or criticized him or threatened him in any way. When C█████ was in her home he would come home from school and sit at the kitchen counter and do his homework. Rex would sleep on his bed until C█████ stopped sleeping at her house. C█████ always had a good relationship with Rex. C█████ never complained about Rex snapping at him or snarling at him or attacking him or doing anything like that. Mother has never heard before that the flying lessons were an attempt to bribe him or that she in any way discouraged him from learning to play the trumpet. While C█████ was with her he never wanted to be in Scouts and never mentioned being in Scouts. Mother never told him that he could not be in Scouts. When C█████ was with her at Neshannock he had A's and never had a problem in school. He had friends, he was in activities. In reference to the video tape that purportedly showed her answering the door naked, she denied being naked and

introduced as part of her case a nightgown brought into the courtroom that was yellow, orange and white stripes and with green stripes, sleeveless and with thin straps which was what she was wearing on the day in question.

Mother has never told C█████ that she wished his father would die and has never said anything derogatory about Father in C█████'s presence. Mother testified that in November of 2013 she asked C█████ where he was staying because he was supposed to be staying with her. C█████ stated that he was staying at M█████ E█████'s house. Mother said to C█████ that he had told her this summer that he and his dad had moved all of his belongings out of Ms. S█████'s house, so where are you sleeping? C█████ responded that M█████ E█████ sleeps in her bed and "I sleep in my dad's old bed." Mother then said, "Well, where does your dad sleep?" and C█████ said, "In the same bed with me." That occurred the last time she saw C█████ other than December 16, 2013. C█████ recorded that conversation. Mother testified that if she were in counseling with C█████ she would want to communicate to C█████ that she loves him very much. She was not aware that C█████ says that he told his father a number of times that he wanted to "cut you". Mother testified that the only harm that she knew of was what Father reported to Dr. Stroyer, which was that C█████ wanted to blow up the school and stab her.

## CONSIDERATION OF BEST INTEREST FACTORS

In a custody case the primary concern is the best interests of the child. As stated in Saintz v. Rinker, 902 A.2d 509, 512

(Pa.Super. 2006), "The best-interests standard, decided on a case by case basis, considers all factors that legitimately may have an effect upon the child's physical, intellectual, moral and spiritual well-being." Cf. <u>Arnold v. Arnold</u>, 847 A.2d 674, 677 (Pa.Super. 2004). The court is required to consider the bests interest factors that are set forth in 23 Pa.C.S.A. §5328(a)(1-16). The Court notes that these factors were addressed in the proceedings before Judge Piccione which culminated in the October 1, 2013 custody order. Although this proceeding constitutes competing petitions to modify that custody order, this Court must conduct an independent inquiry into the statutory factors enumerated in §5328 and cannot simply incorporate by reference the findings from the earlier decision. See <u>M.E.V. v. F.P.W.</u>, 100 A.3d 670 (Pa.Super. 2014). Section 5328(a) specifically provides as follows:

> (a) <u>Factors</u>.- In ordering any form of custody, the court shall determine the best interests of the child by considering all relevant factors, giving weighted consideration to those factors which effect the safety of the child, including the following:
> ....

> (1) <u>Which party is more likely to encourage and permit frequent and continuing contact between the child and other party?</u>

Mother was able to exercise custody of C█████ from February 2013 until late November of 2013, as C█████ began refusing to go to Mother's home shortly after the custody order of October 1, 2013 was issued. Father testified that he tells C█████ that he must see his mother and comply with the Court's order. However, the Court finds that Father's attempts to enforce compliance are

63

rudimentary and not sincere, and that in fact Father has alienated C████ against Mother in order to avoid the results set forth in the October 1, 2013 custody order. The reasoning behind the Court's conclusion is set forth in more detail in the discussion section of this Opinion.

There is no evidence that Mother has interfered with the custody time of Father, and to the extent that she has interfered with C███'s efforts to telephone his father while in custody of Mother, it has only been to address excessive telephone communication between C████ and Father as to interfere with Mother's custody time with C████.

(2) The present and past abuse committed by a party or member of a party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

C████ and Father contend that Mother and the maternal grandfather are physically abusive to C████. The Court finds that the evidence supporting this claim is not credible. C████ testified that he is afraid of Mother and afraid that she and the maternal grandfather will hurt him and have done so in the past. The Court finds that C████ is making such statements in an effort to control the outcome of this case as he is aligned with Father and alienated from Mother, as will be explained further infra.

The Court concludes that there is no credible evidence that either party is physically abusive or verbally abusive towards C████. However, to the extent that Father's efforts to

alienate C████ from Mother may be considered abusive, the Court is concerned that C████ has been psychologically harmed because of the pattern of alienation.

The Court specifically finds that the testimony of Mother and maternal grandfather relative to the incident of November 25, 2012 is credible, and no abuse occurred. The Court here finds, as previous courts have found, that on November 25, 2012, C████ had an extensive telephone conversation with Father while in custody of Mother at Mother's residence. After that conversation ended, C████ acted in a manner whereby he was out of control. Mother attempted to calm C████ down, but C████, without any reason to do so, began to scream for help stating that Mother was going to hurt him. The maternal grandfather arrived to render assistance. Upon arrival, the maternal grandfather found C████ barricaded inside his bedroom. Maternal grandfather was required to push the door open to enter. C████ threw himself on the floor and continued to engage in a tantrum. Maternal grandfather and Mother restrained C████ by holding his arms and legs until he calmed down. Afterwards C████ was fine, had something to eat afterwards, and the next day interacted with the maternal grandfather as though nothing had occurred, spending time with him.

### (3) The parental duties performed by each party on behalf of the child.

Both Mother and Father have appropriately cared for C████ while exercising physical custody relative to preparing of meals, getting Conner to school, seeing to his hygiene and dress

53RD
JUDICIAL
DISTRICT

RENCE COUNTY
ENNSYLVANIA

and otherwise each providing and being able to provide suitable parental care of C███. Aside from the issue of C████'s alienation from and expressed fear of Mother, that is without foundation, Mother and Father are each able to render appropriate parental care.

(4) <u>The need for stability and continuity in the child's education, family life and community life</u>.

Because of the protracted litigation between the parties, C███ lacks stability and continuity in all aspects of his life. He previously attended school in Neshannock Township. However, commencing with the 2014-15 school year, Father, who did not have primary physical custody nor any legal custody pursuant to the court order, enrolled C███ in the Hempfield School District in Westmoreland County. This enrollment is directly in contravention of the October 1, 2013, court order and was done without court approval. Thus, C███ is faced with having to be returned to the Neshannock School District if the custody order does not change. Clearly his family life is undermined in that the result of the extensive litigation is that he has not had contact with his mother and mother's family since December, 2013. C███'s sense of stability is further disrupted by the fact that Mother and Father have a complete inability to communicate with each other in a civil manner. Although C███ is doing well in his current enrollment in the Hempfield School District, C███ is an intelligent young man and will do well in any educational environment. The instability results from the manner of interaction between his

parents. The Court further finds that the pattern of conduct whereby Father drives C███ from Greensburg, Westmoreland County to Neshannock Township, Lawrence County each week so that Conner may exit his father's car, knock on Mother's door and tell her he is not staying, and then proceed to the residence of Father's significant other, videotaping the entire proceeding, even beginning the videotaping in Father's car without objection from Father, is not indicative of stability in his family life.

### (5) The availability of extended family.

The maternal grandparents live near the residence of Mother and have the desire and the ability to assist Mother in caring for C███ and are available on a daily basis. The maternal grandparents express great love for C███ and are devastated by C███'s alienation from Mother and from maternal grandfather. C███ does express a fondness for maternal grandmother and did invite her to have lunch with him, which was successfully accomplished. It is noteworthy, however, that in expressing his fondness for maternal grandmother, C███ also expresses, without foundation, that she is abused. Father does not have extended family that lives in proximity to his residence.

### (6) The child's sibling relationships.

This factor is not applicable as C███ is an only child, and neither parent has any other children.

(7) <u>The well-reasoned preference of the child, based on the child's maturity and judgment</u>.

C█████ is fourteen years of age, clearly possessing a high degree of intelligence, and displays a high level of maturity for his age. C████ does not only demonstrate preference to live with his father, he displays a total disdain for Mother. He states that he is fearful that his mother and/or maternal grandfather will physically harm him. He testified that his mother would threaten him, dig her fingernails into his arm, yell at him and otherwise physically abuse him. C████ himself has stated that he wanted to kill his mother and blow up his school. C████ states that Mother and maternal grandfather attacked him on November 25, 2012 and then on January 1, 2014, Mother attempted to harm him in the incident when C████ exited the car driven by maternal grandmother with Mother seated in the back seat with C████.

The Court specifically finds that C████'s perception of the events of November 25, 2012 and January 1, 2014 are completely unfounded and that there is absolutely no basis for C████ to believe that his mother will harm him in any way.

In answering each question put to him by counsel in the court, C████ answered each question in such a way as to place Mother in the worst light possible. C████ could not identify a single positive memory of any event involving his mother. When asked about flying lessons that he took up until 2012, C████ downplayed Mother's support of the lessons. When he described their vacation taken to South Carolina, he indicated his mother paid little attention to him.

Although C▮▮▮ states that he is fearful of his mother, a video introduced into evidence by Father shows the contrary. Father depicts C▮▮▮ on the telephone with his father and Mother telling him to get off the phone because of the length of time that he has been on the phone. It is clear in the video and the statements made by him and in the manner of expression that C▮▮▮ is clearly goading his mother. He is videotaping her being upset with him being on the phone and the Court finds that this was in effort by C▮▮▮ to get Mother to do something physical that could be used against her in court. His efforts were unsuccessful. Mother's reaction to his obstinance was understandable under the circumstances. One cannot view this videotape and conclude that C▮▮▮ has any fear whatsoever of his mother.

C▮▮▮ testified that his mother would take a voodoo doll hanging above the kitchen sink, and stab the voodoo doll with a knife and smash in the drawer as though she were displaying such aggression against Father. The voodoo doll was stated by him to appear to be wearing scrubs and his father is a physician, would therefore represent Father. When shown the voodoo doll on cross-examination, C▮▮▮ could not explain why the voodoo doll was in excellent condition, other than showing age, contained no evidence of any damage to it and clearly no knife marks. His only explanation was that perhaps the doll had been substituted. Testimony from maternal grandmother was that the doll at a recess was removed from its place above the kitchen sink by

having to unscrew the handle on the cabinet door at it had never been removed prior to having been put there originally.

C█████ testified that on one occasion his mother answered the door totally naked. Mother testified that the occasion C█████ is referring to was an occasion where she answered the door in a nightgown and the nightgown was shown to the Court, with the Court observing that there was nothing improper about it. Early in the trial, Father claimed to have a video of this occurrence. Counsel for Mother demanded the video. It has been produced and entered into evidence, and it does not show Mother without any clothes. All that the video shows is Mother's arm and does not support C█████'s testimony.

In testifying as to living with Father, C█████ describes everything in a positive manner. He enjoys living with his father, enjoys the school he presently attends, describes the school that he presently attends as being a much better school than the school in Neshannock Township, describes Father as good at helping him with homework where Mother was not, gets along well with Father's significant other and enjoys the time that he spends with Father.

In view of the foregoing, the Court finds that C█████'s preference is not well-reasoned; that there is no basis for his disdain towards his mother and that his testimony relative to the conduct of Mother and his fear of her is not credible. C█████'s attitude towards his mother is the unfortunate result of the fact that the parties have been in constant litigation

over him during most of his life and that Father has succeeded in alienating him against Mother.

Mother's position is that Father has clearly turned C▊▊ against her. The Court finds that there is merit to Mother's contention.

C▊▊'s total refusal to be with Mother did not come about until shortly after the October 1, 2013 custody order that gave primary custody to Mother. Until then, C▊▊ did spend an equal amount of time with Father and Mother, changing custody on a weekly basis, and had done so since at least February, 2012. Therefore, it appears that C▊▊'s behavior was simply a way of avoiding compliance with the October 1, 2013 court order and that C▊▊ is behaving the way that Father wants him to in order to retain physical custody.

Father and C▊▊ both state that Father tells C▊▊ that he must comply with the court order and he must go to Mother and that each week at each appointed time of custody exchange Father drops C▊▊ off at Mother's house but C▊▊ simply won't go. C▊▊ will either knock on the door and tell his mother he is not staying or will simply walk through the yard and end up at the Fireside residence of Father's significant other. Father will pick C▊▊ up at Fireside, email Mother as to where C▊▊ is and then return with C▊▊ to Greensburg. However, the Court finds that Father is only paying lip service to the custody order knowing full well that C▊▊ is not going to stay and that Father does not expect him to stay. There is no evidence whatsoever of Father doing anything to require C▊▊

71

to stay. Father drops C███ off in the driveway of Mother's house but does not get out himself to take C███ to the door. These exchanges are generally videotaped by C███ and there is no indication in any videotape of any effort by Father to make C███ stay. In fact, the video tape introduced into evidence by Father shows C███ commencing the videotaping as the car in which he is riding with Father is pulling into the driveway. Father can obviously see that C███ is videotaping and there is no effort to discourage or forbid him from such conduct. The Court finds that this is evidence of the Father encouraging and condoning C███'s behavior. Each time an incident occurred that involved any type of physical contact, Father would immediately file a PFA on behalf of Conner when in reality the occurrences became physical only because of the need to restrain C███ to keep him from hurting himself.

Each time Conner would refuse to stay at his mother's he would run over to the Fireside residence. Entry into the Fireside residence was gained with a code which C███ knew. No effort has ever been made to change the code to prevent C███ from entering that residence. No effort has been made to forbid C███ from entering that residence. The Fireside residence has been made available to Conner by Father and Father's significant other as a place of refuge to avoid having to stay with Mother. It is clear to the Court that if C███ were to be left in the physical custody of Father, there is no reasonable likelihood that C███ could ever have any type of meaningful relationship with Mother as that would be contrary to Father's wishes and

expectations and that under current circumstances, C_____ will do whatever he has to do to meet those wishes and expectations.

In July of 2014, Judge Thomas M. Piccione ordered an updated custody evaluation be prepared by Bruce Chambers, Ph.D. Dr. Chambers conducted the evaluation, prepared a report and testified at the trial in this case. Dr. Chambers recommended that Father be granted full legal and physical custody of C_____. Dr. Chambers concluded that there was no evidence to suggest active alienation on the part of one parent or the other. Dr. Chambers opined that C_____'s preference to reside with his father and to avoid custody with his mother is due to personality issues in Mother whereby she has manifested her anger toward C_____ in a variety of ways. Dr. Chambers stated that Mother appears to have issues with anger management referencing C_____'s statements about her yelling and screaming. Dr. Chambers believed that C_____ was credible in his interviews with him and in his prior interviews with Dr. Darnell. Dr. Chambers concluded that in Mother's household and with the interaction of Mother's parents, there is a lot of animation and yelling in day-to-day communications. Chambers also accepts as credible C_____'s statements that his grandfather could go to jail if he talked about what happened; that no one would believe C_____ and that he would be sent to a mental hospital. Chambers also noted in his interview with C_____ that C_____ commented that most nights when they had dinner together with the grandparents they were nasty, mean, and rude to each other. Dr. Chambers gives C_____ credence in these statements noting that

53RD
JUDICIAL
DISTRICT

IRENCE COUNTY
ENNSYLVANIA

this type of activity would be stressful to C██████. Repeatedly, throughout his report and his testimony, Chambers indicates that C█████ is credible and what he states about Mother and her explosiveness, display of anger, and Mother's behavioral issues that have caused C█████ to fear his mother.

Dr. Chambers also notes that in concluding that there is not parental alienation being engaged in by Father, in true cases of parental alienation the resulting behavior and attitude toward the alienated parent tends to be much more polarized, with children being unable to talk about little positive if anything about the alienated parent. Dr. Chambers noted that this was not the case in his evaluation, Chambers noting that C█████ did describe some positive moments he had with his mother in the past.

Dr. Chambers conceded in his testimony that his conclusions are based upon the fact that he finds C█████ to be credible and that he has been consistent in his statements when his present statements are compared with statements he has made in prior evaluations. He also notes that Mother was pessimistic that any positive outcome could come from the evaluation, that she was less than fully cooperative, with Dr. Chambers noting that Mother's contempt for the process was evidenced in her incomplete pre-evaluation questionnaires. Chambers noted that she was sparse in her information in those questionnaires in regard to herself, issues with Father, and C█████.

The Court here concludes that Dr. Chambers' conclusions are not supported by the record for two distinct reasons. First of

53RD JUDICIAL DISTRICT

RENCE COUNTY
:NNSYLVANIA

74

all, the Court does not find C███ to be credible in his statements relative to Mother's conduct. The Court has had the benefit of a trial whereby C███'s statements relative to Mother's conduct has been subject to the test of cross-examination and rebuttal by other evidence. In this record, there is no indication of Mother being explosive or expressing anger towards C███. At best all that one can say is that she is understandably frustrated by a process whereby she has had by court order primary custody since October 1, 2013 yet has not had C███ since December, 2013. The Court has had the opportunity to view the demeanor of Mother as well as the maternal grandparents and they all appear to be individuals who exercise good common sense, love C███ very much, are dealing with a difficult emotional situation as best as anyone could in these circumstances and are truly heartbroken over the course this case has taken. As above indicated, any claim that C███ fears his mother is clearly negated by the very videos that were introduced by Father where C███ can be seen being aggressive in his desire to anger his mother and in his calculating conduct in videotaping every possible exchange he can, with the purpose of having evidence in court to use against his mother, by his own admission. Unfortunately, Dr. Chambers accepted a view of Mother from his limited ability to analyze the evidence, which is directly contrary to the evidence that the Court was able to evaluate in a trial setting. The Court finds that the underlying factual bases for Dr. Chambers' opinion have been disproven or are unsupported by the record.

Secondly, Dr. Chambers in concluding that there was no indication of parental alienation by Father, bases his conclusion, at least in part, by his determination that C████ did have positive memories of times with his mother and in true parental alienation cases, the situation is much more polarized with the alienated child having little or no positive statements to make about the parent being alienated. Here, when one views C████'s testimony, C████ has nothing positive to say about his mother and the Court cannot conceive of how C████'s attitude towards his mother could be any more polarized. He displays nothing but disdain for her. He entered every question in a manner calculated to place Mother in the worst light possible. When the Court questioned C████ about positive memories with Mother, C████ would put a negative spin on any possible memory that could be considered to be a positive.

On cross examination, Dr. Chambers conceded that if the events that C████ described never happened then the basis for his opinion would be incorrect. The Court concludes that such is the situation in that C████ has consistently attributed to Mother and the maternal grandparents conduct that has in fact not occurred and that a finding of parental alienation is supported by Dr. Chambers own observation that in true parental alienation cases the effected child has little or nothing positive to say about the alienated parent and the child's perception of the alienated parent is polarized.

A psychological evaluation was done of C████ at the request of the Court by Martin Myer, Ph.D., psychologist. In

his conclusion, Dr. Myer notes that the evaluation focused solely on the mental status of C███ and not the psychological or emotional status of the parents. Dr. Myer concluded that the current findings do not suggest significant psychological damage to C███; that he is fairly resilient and even flourishing in the current situation. However, Dr. Myer notes that Mother has not had a chance to parent largely through the willful behavior of C███. Dr. Myer also recommends that counseling occur between C███ and his mother. Dr. Myer even comments that both Mother and Father should seek their own counseling. Dr. Myer does not address the issue of parental alienation other than to indicate that he does not rule it out.

It is also noteworthy that Dr. Chambers referred to the report of Dr. Darnell as support for Dr. Chambers' own conclusions, indicating that Dr. Darnell's conclusions paralleled his own. However, Judge Piccione noted in his Opinion of August 1, 2013, that when Dr. Darnell, in his testimony, was presented with hypothetical questions regarding behaviors displayed by C███ over the course of the past year, Dr. Darnell testified that those behaviors were consistent with behaviors exhibited by a child suffering from parental alienation. See Trial Court Opinion, October 1, 2013, page 24, 25.

(9) <u>Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs?</u>

Both parents love C███ and wish to see C███ flourish in every aspect of his life. Unfortunately, they have a total

inability to co-parent and have exposed C█████ to over a decade of litigation that has clearly affected him emotionally.

C█████'s negative and irrational attitude toward his mother demonstrates that his emotional needs are not being met by Father. Contrary to court order, C█████ has remained in the actual physical custody of Father without legal basis, and this has allowed the situation to get worse in regard to C█████'s feelings toward Mother. C█████'s testimony and that of his Father parallel each other, both being quick to lay blame on Mother who has been put in an almost impossible situation, including her being criticized for not following Father's lead on various issues regarding C█████ when Father is clearly acting in contravention of the custody order.

The Court further notes that the discussion contained relative to factor (8) applies also to relative to the discussion relative to the within factor.

### (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child?

Both parents have the ability to meet the daily physical, developmental, educational and any special needs of C█████. Both maintain more than adequate households, have the ability to clothe and feed C█████ and support him in his educational progress and support him in extracurricular activities. However, C█████'s emotional needs are not being met by Father while in his custody as allowing to remain in his custody has escalated C█████'s negative perception of his mother.

53RD
JUDICIAL
DISTRICT

VRENCE COUNTY
ENNSYLVANIA

78

(11) <u>The proximity of the residences of the parties</u>.

During the time that Mother and Father exercised shared physical custody on a week-to-week basis, the parties lived in the same neighborhood. However, Father has relocated to Greensburg, Westmoreland County, which is approximately an hour and a half drive between the residences of Mother and Father. This distance requires a determination that one party must have primary physical custody, at least during the school year.

(12) <u>Each party's availability to care for the child or ability to make appropriate child-care arrangements</u>.

There is no indication in this case that childcare is an issue. C████ is fourteen years of age and attends school regularly, both parents are employed, Father as a professor at LECOM located in Greensburg, Pennsylvania and Mother being employed in the medical field. The parties had enjoyed shared physical custody with childcare never having been an issue. Mother has the availability of her parents to assist her in attending to C████ if necessary and Father has his significant other, Ms. S████, to assist him.

(13) <u>The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another</u>.

A party's effort to protect the child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

Mother and Father are unable to cooperate with one another. The level of conflict is apparent from a history of constant

litigation between the parties that exceeds ten years. Mother and Father are unable to communicate with each other and what communication that has existed has occurred through emails or text messages. It is necessary for one parent to be awarded sole legal custody because of the inability to agree on any major decision to be made on C████'s behalf.

(14) <u>The history of drug abuse or alcohol abuse of a party or member of a party's household</u>.

Neither party has any history of drug or alcohol abuse.

(15) <u>The mental and physical conditions of the parties</u>

Mother and Father are both healthy and physically capable of caring for C████. Neither party suffers from any mental health disorder.

DISCUSSION

The parties hereto are each seeking modification of the existing custody order of October 1, 2013. Modification of an existing custody order is addressed in 23 Pa.C.S.A. §5338(a) which provides that a court may modify a custody order to serve the best interests of the child. The comment thereto provides that this subsection codifies the standard used in <u>Karis v. Karis</u>, 518 Pa. 601, 544 A.2d 1328 (1988) where the Supreme Court held that a request to modify a custody order requires the court to enquire into the best interests of the child regardless of whether a "substantial" change of circumstances has been shown. <u>Karis</u>, 518 Pa. at 607-8.

53RD
JUDICIAL
DISTRICT

RENCE COUNTY
NNSYLVANIA

80

Additionally, Mother is requesting special relief so that her award of primary physical custody may be materialized. A request for special relief is addressed in 23 Pa.C.S.A. §5323(b) provides that the court may issue an interim award of custody to a party who has standing in the manner prescribed by the Pennsylvania Rules of Civil Procedure governing special relief in custody matters.

Although extensive proceedings have been held on the competing requests for modification, and for special relief and findings of contempt, essentially nothing has changed subsequent to the proceedings that resulted in the October 1, 2013 Custody Order except that C█████ adamantly refuses to be with his mother. C█████'s recalcitrance to being with his mother was recognized by the trial judge in the prior proceedings. In the October 1, 2013 Opinion, the court noted that Father encourages C█████'s unreasonable apprehensions regarding Mother (Page 25); that Father has demonstrated a desire to frustrate Mother's relationship with C█████ (Page 29); that if Father is awarded primary physical and sole legal custody, C█████'s relationship with Mother will dissipate to the point of disrepair (Page 33); that the foregoing analysis finds fault in Father for enabling C█████'s unwarranted fears and trepidations of Mother; the Court believes that Father's actions have caused Mother's relationship with C█████ to suffer, but the Court does not believe that Father's actions should be characterized as alienating (Page 33).

Although the trial court in the prior proceedings stops short of characterizing Father's actions as alienating, the court did attribute C████'s unfounded perceptions of his Mother to be caused by Father's actions and that C████'s thoughts about Mother paralleled those of Father.[5] The court's prediction proved to be true, that if C████ were left in the custody of Father, the relationship with C████ and Mother would only deteriorate. However, the circumstance that allowed Father to have the custody was not brought about by court order, but by the fact that C████ simply refused to be with Mother, and that circumstance has been allowed to exist without being specifically addressed by the court relative to the aspect of enforcement of the October 1, 2013 Order.

The issue of a child refusing to see his mother, although unusual, has been addressed by our appellate courts. In Nancy E.M. v. Kenneth D.M., 316 Pa.Super. 351, 462 A.2d 1386 (1983), the Superior Court held that the fact that a child does not want to see his parent is not a sufficient reason to deny the parent visitation. The Court further held that ordering visitation at the desire of the child was tantamount to denying mother her visitation rights and therefore constituted error.

In Com.Ex Rel. Stoyko v. Stoyko, 267 Pa.Super. 24, 405 A.2d 1284 (1979), the court set down a specific standard to be

---

[5] More recently, Mother filed an injunction proceeding against Father's significant other, seeking to enjoin her from interfering in the custody matters. Holly Thomas v. Mary Ellen Sichak, No. 10191 of 2014, C.A. The same trial judge that issued the October 1, 2013 Custody Order in this case denied injunctive relief, but in a Pa.R.P. 1925(a) Opinion found that the "root of the minor child's behavior seems to have been derived from Dr. Thomas." (Pa.A.R.P. 1925(a) Opinion dated February 4, 2015, page 10.

followed in addressing the child's refusal to see his parent. In <u>Stroyko</u>, the Superior Court held that the stubborn refusal of a child not see his mother should not be allowed to destroy the parent's visitation rights unless some good reason can be shown for the child's attitude. In determining whether the child is justified in his behavior, exploration should be made into Mother's past and present to decide whether the causes for the child's fear and resentment had ever existed or have since vanished. Here, after evaluating all of the available evidence, the Court finds not only that there is no basis for C█████ to have any fear of his mother, the Court also finds that in reality C█████ has no fear towards his mother nor of his maternal grandfather. The Court finds that C█████ expresses this fear only for the purpose of fulfilling his father's expectations that he have no contact with Mother.

In concluding that the conduct of Father is alienating Conner from his mother, the Court points to the following factors:

Both C█████ and Father express the fear that Mother will harm both C█████ and Father. Father has even expressed his fear to the point that he obtained a loaded firearm that he carried with him during the custody exchanges out of fear that Mother would kill him. He has gone as far as carrying this loaded firearm into the Westmoreland County Courthouse during PFA proceedings involving himself, Mother and C█████, leading to his arrest. These fears have been repeated by both C█████ and Father repeatedly during these proceedings, prior proceedings of

53RD
JUDICIAL
DISTRICT

RENCE COUNTY
INNSYLVANIA

83

this case and in all of the related proceedings in this Court and in Westmoreland County. Other than the testimony of C█████ and Father, there has not been one iota of evidentiary support for these expressed fears. Neither this Court nor any other court has found any support for these expressed fears. The available evidence leads to the conclusion that the expression of fear is contrived. Similarly, C████'s expression of fear towards his maternal grandfather is incredulous, and has been so found by this Court and in prior court proceedings in this Court and in Westmoreland County. Equally incredulous is C████'s statement that the maternal grandfather called him a "worthless piece of shit", the Court making this finding after observing the grandfather and assessing his testimony and demeanor.

Other claims of C█████ have been disproven. C█████ claimed that Mother answered the door on one occasion naked and it was represented that there existed a video to support the claim. The video that was requested to be produced did not show what he had described.

C█████ claimed that Mother had stabbed and smashed a voodoo doll representing her desire to kill Father. The exact voodoo doll produced was not damaged in the least. Further evidence showed that the doll could not be easily removed from where it was affixed, and when C█████ was confronted with the doll he suggested that perhaps it had been replaced.

C█████ also suggested that Mother had placed his picture next to the voodoo doll indicating her desire that C█████ should also be harmed just like Father should be. Evidence showed that

the picture C███ was referring to was a picture of C███ that Mother carried, out of love, on her keychain, which hung on a hook next to the "voodoo doll".

Father and C███ engaged in a procedure whereby at the time Mother was to receive C███ for her period of custody, they would drive into Mother's driveway, C███ would exit the vehicle, videotaping all the way, either knock on Mother's door and tell her he was not staying or simply bypass the house, and then walk over to the Fireside residence, wait for his father and then return to Greensburg. The fact that this was a mere charade for court purposes is indicated by the fact that a video shows that C███ begins videotaping while in the vehicle with his father, that father knows to wait for C███ at the Fireside residence instead of simply leaving, and allows C███ to have continued access to Fireside by not requiring that the code for entry into the home be changed from the code that C███ is aware of, allowing Conner to have access to a safe haven to avoid having to be with Mother.

C███'s claim of fear of his mother is disproven by a video in which Mother attempts to direct C███ to get off the phone, having spent a considerable time on the phone with his father. In the video Mother is understandably frustrated as C███ is obstinate in his refusal to get off the phone and can be seen and heard taunting his mother in an obvious attempt to get her to lose her temper while C███ is videotaping her. C███ himself testified that he uses the video for purposes to be used in court against his mother.

With regard to the use of the video, Father has the obvious ability to prevent C▮▮▮ from videotaping, even to the extent of removing the phone from him if necessary but makes no effort to do so.

In every custody exchange attempted where Father drops C▮▮▮ off at Mother's house, there is not one initiative that Father has done anything that can be observed by any person whereby he attempts to make C▮▮▮ stay with his Mother.

Additionally, the evidence in this case is compelling that C▮▮▮ will in fact do whatever his father directs him to do. The evidence is clear that Father directs every aspect of C▮▮▮'s life. It is simply unbelievable that C▮▮▮ will adhere lockstep to every directive and expectation of Father except as to this one aspect of his life relating to seeing his mother. The Court finds that if Father did in fact direct C▮▮▮ to stay with his mother, he would obey his father.

The matters before the Court include the emergency petition for special relief filed December 3, 2013 as supplemented by the emergency supplemental petition filed January 7, 2014. The issues raised in these petitions are the same issues that will be considered as part of the determination of the competing claims for modification of the custody order. Thus, the disposition of these motions do not require a separate analysis since these petitions addressed what has already been discussed, the inability of Mother to effectuate the custody order by reason of C▮▮▮'s refusal to go to her home and Father's role in bringing that situation about or permitting it to exist.

86

The Court is required to separately address the petition for contempt filed April 8, 2014 and the petition for contempt filed September 4, 2014.

The April 8, 2014 petition alleges that Father has denied or coerced, conspired or otherwise controlled C▮▮▮ in an effort to deny Mother her primary physical custody; that Father pay lip service to the October 1, 2013 order by dropping C▮▮▮ off at Mother's residence every other Sunday, at which time C▮▮▮ gets out of the car, runs to Father's significant other's residence at Fireside where Father is waiting for C▮▮▮, and they depart; that Father intentionally, willfully and wantonly thwarts Mother's relationship with C▮▮▮; that Father fails to uphold Mother as a parent that C▮▮▮ should love and respect; that Father blatantly undermines Mother's role as a parent; and that Father speaks in a derogatory, condescending, and otherwise inappropriate manner about Mother to C▮▮▮ in an effort to reinforce C▮▮▮'s unfounded, nonsensical beliefs about Mother; and that Father refuses to communicate with Mother and provide her any information about C▮▮▮.

The Petition for Contempt filed September 5, 2014 alleges that Father has willfully and wantonly withheld C▮▮▮ from the Neshannock Jr./Sr. High school where he was enrolled for the 2013-14 school year and, without any authority to do so, enrolled C▮▮▮ in the Hempfield School District in Westmoreland County. Father also incorporates by reference to the Petition for Contempt filed April 8, 2014.

The issue of contempt is addressed in 23 Pa.C.S.A. §5323(g), addressing contempt for noncompliance within a custody order. That subsection provides as follows:

(1) A party who willfully fails to comply with any custody order may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:

    (i) imprisonment for a period of not more than six months.

    (ii) a fine of not more than $500.00.

    (iii) probation for a period of not more than six months.

    (iv) an order for nonrenewal, suspension or denial of operating privilege under §4355 (relating to denial or suspension of licenses).

    (v) counsel fees and costs.

(2) An order committing an individual to jail under this section shall specify the condition which, when fulfilled, will result in the release of that individual.

In order to support a finding of contempt, it must be found that the offending party failed to comply with a clear and specific provision of a custody order, and that the failure to comply was intentional and willful. A finding of contempt cannot be supported if based upon an original order that is vague. Mellott v. Mellott, 328 Pa.Super. 200, 476 A.2d 961 (1984). A custodial parent's obstruction of the noncustodial parent's right to visit the child may serve as the basis of an order finding the offending party in contempt. As held in English v. English, 322 Pa.Super. 234, 469 A.2d 270 (1983), the obstruction of a child's visits with a parent will not be tolerated and a parent who obstructed a child's visits with the

other parent was in contempt of an order providing for visitation rights. Even an honest belief that visits between child and parent was causing the child psychological harm could not justify the deliberate violation of a court order providing for visitation. English v. English, Supra.

The Court here finds that the specific allegations of the April 8, 2014 Contempt Petition cannot form the basis for a finding of contempt. Although the Court has clearly indicated that Father is alienating C████ against Mother, the specific allegations of the petition are either too general and vague or were unproven. As held in Sutliff v. Sutliff, 361 Pa.Super. 194, 522 A.2d 80 (1987), a party cannot be held in contempt for failing to "encourage" visitation without a finding that a specific provision of the order was violated and that the provision was clear and definite. Such contentions as allowing C████ to have refuge at Fireside may violate the spirit of the order, not specific provisions thereof.

However, the Court finds that Father is in contempt of the October 1, 2013 Order by enrolling C████ in the Hempfield School District in Greensburg, Pennsylvania. Paragraph 2 of the October 1, 2013 Custody Order specifically provides that Mother is awarded sole legal custody of C████. That paragraph defines legal custody as the legal right to make major decisions affecting the best interests of the child. Major decisions affecting the child include education and education is specifically identified in the court order. At the time the October 1, 2013 Order was issued, C████ attended school in the

Neshannock Township School District, the school district in which Mother resided, mother having been awarded primary physical and legal custody and was the school district that C███ had been attending in recent years. C███ continued to attend the Neshannock School District through the end of the 2013-14 school year. Prior to the commencement of the 2014-15 school year, Father, willfully, and without authority, and without the consent of Mother, enrolled C███ in the Hempfield School District in Westmoreland County, the county in which Father resides. Father had absolutely no authority to do this and such conduct was in direct contravention of the October 1, 2013 Custody Order. Father did not seek approval of the Court in enrolling C███ in the Hempfield School District but simply took it upon himself to do so. In accomplishing this enrollment, Father represented on an enrollment form that he had custody of C███, which is in contravention of the October 1, 2013 Custody Order. The Court finds that Father's actions in this regard were intentional and willful.

The Court finds that the conduct of Father violates Paragraph 2 of the October 1, 2013 Custody Order.

## CONCLUSION

For the forgoing reasons, the Court will issue an order consistent with this Opinion which will dismiss the claim of each party for modification of the existing custody order of October 1, 2013 as to primary physical custody, partial custody and legal custody, but will grant Mother special relief relating

53RD
JUDICIAL
DISTRICT

/RENCE COUNTY
ENNSYLVANIA

90

to enforcement of the order, and grant Mother's contempt petition filed September 5, 2014.